STATE

v.

**Frederick WILDING.**

No. 90–606–C.A.

Supreme Court of Rhode Island.

March 8, 1994.

Jeffrey Pine, Atty. Gen., Andy Berg, Sp. Asst. Atty. Gen. and Aaron Weisman, Asst. Atty. Gen., for plaintiff.

Robert B. Mann, Providence, for defendant.

OPINION

WEISBERGER, Justice.

This case comes before us on appeal by the defendant, Frederick Wilding (Wilding or defendant), from a judgment of conviction of murder in the second degree entered in the Superior Court after a trial by jury. We vacate the conviction and remand for a new trial. The facts of the case insofar as pertinent to this appeal are as follows.

Cassandra Quattrocchi (Cassandra) was born October 17, 1986. Her biological father was Wilding. The mother of the child was Julie Quattrocchi (Julie), who later assumed her husband's surname and was known at the time of the trial as Julie Brindamour.

On November 2, 1986, Julie decided to attend a bingo game with her friend Beverly Vanasse (Beverly). Julie fed the baby prior to her departure. At that time the infant had no significant marks on her body and appeared happy and content. Julie and Beverly departed at approximately 5:30 to 6 p.m.

A short time later, Rhonda Oatley (Rhonda), a neighbor, went to Beverly's apartment where the baby was in Wilding's care. He complained that the baby cried constantly while in his care, although she did not cry when she was with her mother. Rhonda changed the baby and gave her a bottle. She later testified that when she was present, there were no marks or bruises on the baby's body.

At approximately 10:30 p.m. Julie and Beverly returned to Beverly's apartment. Upon entering the apartment, they found the baby lying on a couch, hardly breathing and covered with black-and-blue marks. They immediately took the baby to Rhode Island Hospital. At the hospital Cassandra was

initially seen by Karen Rednor, M.D., a pediatrician assigned to the emergency room. Doctor Rednor later testified that Cassandra was bruised on her right cheek and forehead and was scarcely breathing. When the baby's hair was shaved, the doctor observed a purplish-reddish mark that seemed to be in the shape of a hand. The doctor testified that the bruises and other symptoms were indicative of severe external and internal traumatic injury to the head. She expressed the opinion in testimony that the injuries to the baby occurred during the same night that she was admitted to the hospital. Despite treatment, Cassandra died the following week.

William Sturner, M.D., the Chief Medical Examiner for the State performed an autopsy. He testified that the injuries which caused the death seemed consistent with the baby having been struck by a human hand. He expressed an opinion that the manner of death was homicide. A medical witness, Theodore Southgate, M.D., presented by defendant, testified at trial that in his opinion the injuries that caused Cassandra's death had been suffered long before the hospital admission. Doctor Southgate had not actually treated Cassandra, nor had he performed the autopsy. His opinion was based on a review of the hospital record.

After investigation the Providence police charged defendant with child abuse and later after the death of Cassandra, with murder in the first degree. On January 26, 1990, a jury rendered a verdict finding defendant guilty of murder in the second degree. Thereafter, defendant was sentenced to sixty years at the Adult Correctional Institutions, thirty-five years to serve and twenty-five years suspended, with twenty-five years probation to commence upon defendant's release.

The defendant raises a number of issues in support of his appeal. Further facts will be provided in order to deal with those issues that are necessary to this opinion.

I

The Motion To Suppress

On the night of Cassandra's admission to the hospital, Lieutenant Paul Fitzgerald and Patrolman John O'Connor were dispatched to investigate the origin of the baby's injuries. They proceeded to the trauma unit where they discussed the situation with Rick Cardin (Cardin), an investigator for the Department of Children and Families. Cardin informed the officers of the baby's serious condition. Lieutenant Fitzgerald interviewed Julie and Beverly The two women generally outlined the evening's circumstances, which were that upon their leaving the child in defendant's care, she was in apparently good condition but that upon their return, she was found to be gravely injured.

After discussing the matter with Julie and Beverly, the two policemen interviewed defendant in a family conference room at the trauma unit. Lieutenant Fitzgerald told defendant that he was suspected of child abuse but did not place him under arrest or state to him that he was required to submit to questions. The lieutenant advised defendant of his *Miranda* rights. Following the admonition Wilding indicated by nodding his head that he understood and stated that he was willing to speak to the officer.

Wilding stated that he had noticed injuries to the baby a few minutes after Julie and Beverly had left the apartment. He denied that he had dropped the baby and further stated that there had been no visitors to the apartment during the time the baby was in his custody. Even at this point the lieutenant did not place defendant under arrest but requested that he, along with Julie and Beverly, come to Providence police headquarters for further investigation.

At police headquarters the investigation was transferred to Sergeant Louis DeFrances. Lieutenant Fitzgerald briefed the sergeant on the information that he had obtained from his investigation at the hospital. The sergeant testified that he formed the impression from the lieutenant that no one was under arrest but that the investigation should continue. The defendant was first asked if he was willing to make a statement. He replied that he was.

He was then taken to an interview room where the sergeant again orally informed him of his *Miranda* rights by reading from a

prepared form. The sergeant further told defendant that he was suspected of child abuse. At this point the sergeant submitted the *Miranda* form to defendant and asked him to initial each admonition if he understood it. The defendant initialed each of the five admonitions and checked yes to the question as to whether he understood his rights. He then gave an eight-page statement in a question-and-answer format that was reduced to writing and signed by him and by Sergeant DeFrances as a witness. In effect defendant denied dropping or hitting the baby but stated that he was alone with her from the time that Beverly and Julie left until they returned. He stated that upon Julie's return he was both scared and mad and told Julie to go look at the baby. At that point defendant, Beverly, and Julie took the baby to the hospital. Both this statement and the earlier oral statement were introduced into evidence at the trial.

■ The defendant argues that these statements should not have been admitted into evidence because defendant at the time of the first statement was illegally detained. *See State v. Mattatall,* 510 A.2d 947, 950–51 (R.I.1986). The trial justice found as a fact and held as a matter of law that defendant was not under arrest at the time of the interview at the hospital and further found as a fact and held as a matter of law that the officer at the time of the interview had probable cause to arrest defendant. We are of the opinion that the trial justice was clearly correct on both issues.

There is no question that after the interviews of Julie, Beverly, and Cardin, Lieutenant Fitzgerald had probable cause to believe that a crime had been committed and that defendant, who had been alone with the child during the course of the evening, was the person who had committed it. These circumstances would meet every test ever formulated by this court or the Supreme Court of the United States. *See, e.g., Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *State v. Brennan,* 526 A.2d 483 (R.I.1987); *State v. Pacheco,* 481 A.2d 1009

(R.I.1984); *In re John N.,* 463 A.2d 174 (R.I.1983); *In re Armand,* 454 A.2d 1216 (R.I.1983); *State v. Welch,* 441 A.2d 539 (R.I. 1982).

Nevertheless the lieutenant, out of an abundance of caution, decided not to arrest defendant but to carry on his investigation further. In the circumstances he was not required to give *Miranda* warnings, since two elements are required in order that the prophylactic rule of *Miranda* should apply. These elements are (1) custody and (2) interrogation. *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. Kennedy,* 569 A.2d 4, 7 (R.I.1990); *State v. Caruolo,* 524 A.2d 575, 579 (R.I.1987).

■ Nevertheless the officer, with impeccable regard for defendant's rights, instructed defendant concerning the *Miranda* admonitions orally. In this case, even if defendant had been in a custodial setting the oral admonitions would have been sufficient. There is no requirement that *Miranda* warnings be given in writing as a constitutional imperative. Indeed *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966), in its precise holding uses language that would clearly permit oral warnings. Further Chief Justice Warren was specific in stating that Congress and the states were free to develop their own safeguards with respect to methods of advising suspects of their rights necessary to protect their privilege against self-incrimination. *Id.* at 490, 86 S.Ct. at 1636, 16 L.Ed.2d at 732. Nor is there a requirement that a suspect must sign a waiver. *See North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). We are of the opinion that Lieutenant Fitzgerald either met or exceeded every constitutional requirement for the admissibility of the initial statement.

In respect to the eight-page statement taken at the police station, the trial justice was again correct in finding as a matter of fact and holding as a matter of law that defendant was not under arrest at the police station but that in any event Sergeant DeFrances had met every requirement of the *Miranda* prophylactic rule in eliciting the state-

ment. The defendant's contention that the eight-page statement was the "fruit of the poisonous tree," *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), resulting from an alleged illegal detention at the hospital is without basis in either fact or law and does not require extensive analysis. In passing upon the admissibility of the eight-page statement, the trial justice carefully examined every element, found that defendant was calm, and sober, that he waived counsel, that there was no promise or coercion, and that defendant voluntarily decided to make the statements to Sergeant DeFrances that were ultimately signed and recorded. In this finding, not only was the trial justice's ruling unassailable on review by our deferential standard, *State v. White,* 512 A.2d 1370, 1375 (R.I.1986); *State v. Fuentes,* 433 A.2d 184, 189–90 (R.I. 1981), but we are also of the opinion that he was absolutely correct both factually and legally. Consequently defendant's claim that the oral statement and the written statement were improperly admitted is rejected as being without merit.

## II

### The Jury Instruction

■ The defendant argues that the trial justice erroneously instructed the jury in respect to the elements of the crime of murder. On this issue defendant is correct. He points out that the trial justice in his definition of murder made the following statement: "Malice may also exist without actual intention or any mischief, if the killing is the consequence of careless action."

In a lengthy instruction on the elements of murder and manslaughter (both voluntary and involuntary), the trial justice generally gave correct instructions on the law. However, the quoted statement to which defendant's counsel objected is not correct. Murder in the second degree requires an intent to kill. This intent may not be inferred from

mere negligence or carelessness. As we have said in *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I.1980), malice may be inferred from the circumstances surrounding a defendant's conduct and the events leading up to the death of the victim. Such an inference may be drawn from a battery upon a child or by blows without a weapon. It may be inferred from a single blow of a hand if it was likely to cause severe injuries to a young child. *Id.* We further stated that malice might be inferred from heedless indifference to the consequences of an act or recklessness. *Id.* However, mere negligence or carelessness cannot support the malice that would be necessary to a finding of murder in the second degree (an intentional killing).

We believe that the trial justice's reference to "carelessness" may have been inadvertent. Nevertheless, counsel for defendant did specifically object to that portion of the charge. However, he included this objection in a lengthy and unfocused series of objections, most of which were of little or no significance.[1] Undoubtedly, had the trial justice's attention been focused on this element of his charge, he may well have corrected it. Nevertheless, the objection was sufficient to preserve this issue on appeal.

■ We cannot say that the error was harmless since there was evidence in the case (although slight) that might have caused the jury to find that defendant had in some way been negligent, in a degree less than the recklessness required to raise the crime from manslaughter to murder. *See State v. Hockenhull,* 525 A.2d 926, 929–30 (R.I.1987); *State v. Iovino,* 524 A.2d 556, 558 (R.I.1987).

Consequently the appeal of defendant is sustained on this issue so that a new trial will be necessary.

In light of our holding on the issue of the jury instruction, it will not be necessary to pass upon the numerous evidentiary issues raised by the defendant in his brief. There is no reason to believe that these identical

1. For example, the objection raised as to the failure of the trial justice to instruct the jury on child abuse as a lesser-included offense of the crime of murder is without merit. Each of these offenses requires proof of a fact that the other offense does not. Thus, child abuse does not

meet the test of a lesser-included offense. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *State ex rel. Scott v. Berberian,* 109 R.I. 309, 316, 284 A.2d 590, 594–95 (1971) (adopting the *Blockburger* test).

issues will be presented in the course of a retrial or that the rulings on the issues would be the same. It is unnecessary for us to engage in what may well be an hypothetical or advisory analysis of these questions.

For the reasons stated, the appeal of the defendant is sustained. The judgment of conviction is vacated, and the papers in the case are remanded to the Superior Court for a new trial.