STATE

v.

Frederick WILDING.

No. 97–100–C.A.

Supreme Court of Rhode Island.

Nov. 9, 1999.

Annie Goldberg, Aaron L. Weisman, Providence, for Plaintiff.

Janice M. Weisfeld, Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

Cassandra Quattrocchi (Cassandra) was born on October 7, 1986. On November 2, 1986, she was severely beaten about the head, sustained severe brain injury, and died on November 10, 1986. Her total lifetime was thirty-four days; total weight, some seven pounds; total height, twenty-one and one-quarter inches.

Frederick Wilding (Wilding), Cassandra's biological father, was indicted for, and charged with her murder. Following this, his second, conviction for murder in the second degree by a Superior Court trial jury, he appeals to this Court, seeking reversal of his conviction and a second new trial.

Wilding asserts on appeal that the trial justice erred (1) by refusing to permit the introduction of certain psychological-counseling records during the cross-examination of the victim's mother, which he claims suggested that the mother engaged

in a pattern of child abuse directed at her current children, thereby denying him his constitutional right to present a defense and confront his accuser, (2) by refusing to instruct the jury on a charge of involuntary manslaughter caused by criminal negligence, (3) by refusing to allow defense counsel to cross-examine a witness concerning that witness's previous involvement with the Department for Children, Youth and Families (DCYF) and (4) by allowing a witness to testify to hearing a sound that the witness characterized as a baby's screech.

## I

### Facts and Travel

Cassandra was the biological daughter of Julie Quattrocchi (Julie) and Wilding. At the time of Cassandra's birth on October 7, 1986, Julie and Wilding were living together in West Warwick, but shortly thereafter they moved to Pelham Street in the city of Providence into an apartment owned by Wilding's stepfather. While living there on November 2, 1986, Julie and a friend, Beverly Vanasse (Beverly), decided to attend a bingo game in North Providence and left Wilding to babysit for Cassandra in Beverly's apartment. Julie and Beverly left for the bingo game at approximately 5:30 p.m. Before leaving, Julie changed Cassandra and dressed her in sleepwear. Beverly then fed Cassandra and, after doing so, handed her to Wilding, who was sitting at the kitchen table. At that time Julie observed no marks or bruises on the baby's head or face, and she described Cassandra as having taken her feeding without any difficulty.

At approximately 6:30 p.m., after Julie and Beverly had left the apartment, Rhonda Oatley (Rhonda), a neighbor of Beverly's, visited Beverly's apartment. When she arrived there, Wilding complained to her that although Cassandra had not cried prior to Julie's leaving the apartment, after Julie had left, Cassandra had been constantly crying. Rhonda then volunteered to change Cassandra's diaper, which she did, and then fed her some baby formula from a nursing bottle in order to comfort her. Rhonda at that time observed no marks or bruises on the infant.

Julie and Beverly returned from the bingo game at about 10:30 p.m. When they arrived at the apartment, the front door was locked and they had to knock on the window to gain Wilding's attention. When Wilding opened the door, he stepped in front of Julie, stopped her, and said, "[C]an I have my fucking coat. Somebody over my stepfather's beat the baby." Hearing this, Beverly ran into the apartment parlor, followed by Julie, where they found Cassandra lying on a couch, barely breathing, and observed bruises and black and blue marks on the right side of the infant's face. Beverly picked up Cassandra, who was cold and limp, and she and Julie told Wilding, who was still in the apartment, that they were taking Cassandra to the hospital. He tried to dissuade them from doing so, but they persisted and left the apartment with Cassandra for the hospital. Wilding reluctantly accompanied them and sat in the rear seat of the automobile. On the way to the Rhode Island Hospital, Wilding told Julie and Beverly not to tell the hospital officials that he had been caring for Cassandra, fearing "he would be blamed for what happened."

At the hospital Cassandra was initially seen by Karen Rednor, M.D. (Dr. Rednor), a pediatrician assigned to the emergency room. Doctor Rednor later testified that when she first saw Cassandra, the baby was barely breathing and had bruises around her right eye and cheek area and on her forehead. When the baby's head was shaved, the doctor observed a purplish-reddish mark that seemed to be in the shape of a hand. The doctor testified that the bruises and other symptoms were indicative of severe external and internal traumatic head injury. She expressed the opinion during her testimony at trial that the injuries to the baby occurred on the same night of her admission to the hospi-

tal. Despite treatment, Cassandra died eight days later on November 10, 1986.

William Sturner, M.D. (Dr. Sturner), a former Chief Medical Examiner for the State, performed an autopsy upon Cassandra. At trial Dr. Sturner testified that the injuries that had caused Cassandra's death seemed consistent with the infant's having been struck by a human hand. He opined that the infant's death was a homicide.

The Providence police initially charged Wilding with child abuse. After the death of Cassandra, he was indicted and charged with murder in the first degree. On January 26, 1990, after a Superior Court jury trial, Wilding was found guilty of murder in the second degree. Thereafter, he was sentenced to a term of sixty years' imprisonment at the Adult Correctional Institutions, thirty-five years to be served and with the remaining twenty-five years to be suspended. He was also placed on probation for twenty-five years, commencing upon his prison release. On appeal this Supreme Court set aside that conviction and ordered a new trial. *State v. Wilding,* 638 A.2d 519 (R.I.1994) (*Wilding I* ). On May 4, 1995, following his second jury trial, Wilding was again convicted of second-degree murder. He was sentenced this time to a term of sixty years' imprisonment, of which forty years was to be served with twenty years suspended, and with probation for twenty years to commence upon his release from prison.

Wilding raises a number of issues in support of this, his second, appeal. Additional facts as may be necessary in order to deal with those issues will be provided.

## II

### The Psychological–Counseling Records

Julie, in late 1993, some six years after Cassandra's death, sought psychological counseling from the Providence Center. The Providence Center records reveal that Julie's treatments extended over nineteen counseling sessions, ending in May of 1994. Those records describe Julie as a mother who experienced severe depression after the death of Cassandra and who thereafter struggled with parenting her later-born children. The records also describe Julie as a mother who had displayed periodic episodes of violence directed at her later-born children. Wilding attempted to introduce those records during the cross-examination of Julie. The trial justice sustained the state's objection to their admission, concluding that "such testimony is too remote in time to be relevant to what did or did not happen back in 1986".and also that this testimony would not qualify as impeaching testimony.

■ On appeal Wilding argues that the trial justice's refusal to allow his counsel to inquire into Julie's psychological records constituted a violation of his constitutional right to present a defense as guaranteed by the Federal and the State Constitutions. Wilding argues that the introduction of these records on cross-examination would have bolstered his defense theory that it was Julie, not he, who was responsible for Cassandra's death. Our review of the trial record leads to the conclusion that the trial justice did not err in restricting defense counsel's inquiry regarding Julie's Providence Center counseling records.

■ It is well settled that questions pertaining to the relevancy of evidence are left to the sound discretion of the trial justice. *State v. Tempest,* 651 A.2d 1198, 1215 (R.I.1995). This Court will defer to a trial justice's determination of relevancy, absent a showing that the trial justice has clearly abused his or her discretion. *State v. Cote,* 691 A.2d 537, 543 (R.I.1997) (citing *Tempest,* 651 A.2d at 1216).

On the record before us, we observe that Julie's counseling sessions occurred some six to seven years after Cassandra's death. The fact that Julie became severely depressed and may have had abusive episodes directed toward her later-born children, years after the death of Cassandra, could not be significantly probative of the probability of her ever having abused Cas-

sandra. All the trial evidence indicated the contrary. The question in issue during the trial was whether Wilding had inflicted the blows that had caused Cassandra's death and not whether Julie had inflicted those blows. *State v. Filuminia*, 668 A.2d 336, 339 (R.I.1995). "The propensity of another person to commit similar acts in regard to other individuals would not in any way tend to exculpate the defendant in respect to his charges." *Id.*

We also note, pursuant to Rule 608(b) of the Rhode Island Rules of Evidence, that

> "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, or, in the discretion of the trial judge, evidence of prior similar false accusations, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

■ We have consistently held that "[a] witness may not be impeached on collateral matters by the introduction of extrinsic evidence. The cross-examiner is restricted to the answers of the witness." *State v. Tutt*, 622 A.2d 459, 462 (R.I.1993) (quoting *State v. Brown*, 574 A.2d 745, 749 (R.I. 1990)). Therefore, for the reasons discussed above, we conclude that the trial justice did not err in excluding admission of Julie's counseling records.

### III

### The Involuntary Manslaughter Instruction

■ During his trial, Wilding's defense was premised on the theory that Cassandra had sustained a subacute head injury prior to the night of November 2, 1986, and it was that prior injury that had caused her death. In support of this theory the defense presented two witnesses, Theodore Southgate, M.D. (Dr. Southgate), and Leola Elliot (Leola), a lifelong friend and fourth cousin to Wilding. Doctor Southgate testified that he thought the baby's injuries could have been inflicted up to two weeks prior to admission to the hospital and that he thought it was unlikely that a blow from a hand caused the baby's injuries. Leola testified that she had seen the baby fall from a table onto a thinly carpeted concrete floor on November 1, the day prior to Cassandra's admission to the hospital. Leola further testified that the fall left a large lump on Cassandra's head.

The trial justice was apparently unimpressed, as was the trial jury, with the evidence from the defense witnesses who testified in support of the subacute previous injury theory. First, the trial record indicates that Leola changed her testimony from that given at Wilding's first trial. She testified at the first trial that Julie had told her that Cassandra had fallen from a table. In the second trial, Leola claimed actually to have witnessed Cassandra's fall from the table. Under cross-examination, Leola admitted that she had lied under oath at the first trial. She claimed, in attempting to minimize the effect of her previous false testimony, that she had been addicted to drugs at the time of the first trial and feared that if she testified favorably for Wilding, DCYF would take away her child. That attempt by Leola to exculpate herself from the damaging effect of her previous false testimony did not impress the trial justice and was obviously later rejected by the trial jury.

Doctor Southgate's expert testimony is seen as similarly wanting. He testified as to his belief that the baby's injuries did not occur on the night of November 2, 1986. However, his testimony was based solely on Cassandra's medical records. He had never seen Cassandra, was not present at

the autopsy, and did not consult with any physician involved in her treatment or autopsy. Doctor Southgate also failed to express his findings to a reasonable degree of medical certainty but instead based them upon what he "thought" could have happened.

On the basis of that trickle of wanting testimony, the defense requested an instruction on involuntary manslaughter, defined as the performance of a lawful act with criminal negligence. The trial justice declined, however, to give that specific requested instruction of involuntary manslaughter based upon criminal negligence but did charge the jury on involuntary manslaughter, defining it as "unintentional homicide without malice aforethought committed in the performance of an unlawful act not amounting to a felony." The defense had argued that the lawful act it relied upon for its requested instruction was Wilding's care given the baby on the night of November 2, 1986. The trial justice aptly noted, however, in ruling upon the requested instruction, that he could find no evidence that Wilding had negligently cared for Cassandra and upon which he could base such a negligence-manslaughter jury instruction.

■ We have held that "[w]hen the evidence supports a possible verdict on a lesser included offense, the defendant is entitled—and the trial justice is required—to instruct the jury on that lesser included offense." *State v. Campbell*, 691 A.2d 564, 572 (R.I.1997) (quoting *State v. Messa*, 594 A.2d 882, 884 (R.I.1991)). A jury charge on a lesser included offense is not necessary, however, "when such a charge is wholly unsupported by the evidence." *Id.* (quoting *State v. Figueras*, 644 A.2d 291, 294 (R.I.1994)). As pertains to this case it is well settled "that instructions should not be given on lesser degrees of murder or manslaughter unless there is evidence in the case to support such a finding." *State v. Parkhurst*, 706 A.2d 412, 423 (R.I.1998) (quoting *State v. Tarvis*, 465 A.2d 164, 171 (R.I.1983)).

■ "[B]efore the trial justice is required to give an instruction on manslaughter, the evidence must show, however minimally, that the defendant acted without malice, either in the heat of passion with adequate provocation or in the commission of an unlawful nonfelonious act or in the performance of a lawful act with criminal negligence." *State v. Kaner*, 463 A.2d 1348, 1351 (R.I.1983).

There is no evidence in the trial record that would support Wilding's requested jury instruction. That record is devoid of any evidence to support his contention that he had negligently injured Cassandra in any way during the course of babysitting for her on the night of November 2, 1986, or that he had negligently failed to take care of her. His trial defense strategy was that Cassandra had been injured previously when she fell from a table while in Julie's care and that any negligence in treating Cassandra was that of Julie's, and not his own. The totality of the trial evidence in the record indicates that Wilding forcibly struck Cassandra six times. Wilding's defense, on the other hand, was that he never did strike her negligently or otherwise and that he had not been negligent in caring for her.

■ Further, Wilding's request for the negligence—and absence of malice—involuntary-manslaughter charge ignores our teachings in *Wilding I* and *State v. McGranahan*, 415 A.2d 1298, 1302 (R.I. 1980). In those cases we stated that malice could be inferred from circumstances surrounding the conduct of a. defendant and "[i]t may be inferred from a single blow of a hand if it was likely to cause severe injuries to a young child." *Wilding I*, 638 A.2d at 522. "Malice can also be inferred from circumstances where there is disparity in size and strength between the victim and an assailant." *McGranahan*, 415 A.2d at 1303 (citing *People v. Drumheller*, 15 Ill.App.3d 418, 304 N.E.2d 455, 457–58 (1973); *State v. Morris*, 564 S.W.2d 303, 312 (Mo.Ct.App.1978)). Cas-

sandra at autopsy was said to weigh but approximately seven pounds and was twenty-one and one-quarter inches in length.

We conclude from the trial record that there was no sufficient evidence from which could be inferred any nonmalicious or negligent act on the part of Wilding and which would have permitted the trial justice to give the requested manslaughter-negligence instruction. His claim of jury instruction error is without merit.

## IV

### Beverly Vanasse's DCYF Contacts

Beverly, a state's witness, testified that prior to leaving the apartment to go to play bingo with Julie on the night of November 2, Cassandra was in good health and had no marks or bruises on her body. After returning from the bingo game, Beverly testified that she found Cassandra on the parlor couch, limp, barely breathing, cold to the touch, and blue in the face.

■ On cross-examination, defense counsel attempted to explore Beverly's contacts with DCYF concerning her own children. The state's prosecutor objected to that line of inquiry. Defense counsel contended that this line of cross-examination went directly to Beverly's ability to observe the condition of Cassandra. Defense counsel also asserted that Beverly's demeanor while testifying, punctuated by strong emotion, could have also been triggered by Beverly's own recollections of her prior dealing with DCYF and her loss of custody of her own child to that agency. The state's objection asserted that Beverly's contacts with DCYF had occurred some six years prior to Cassandra's death and were too remote in time to be relevant. Further, the prosecutor argued that Beverly had only been questioned on direct examination about her observations of Cassandra's condition on November 2, 1986. Accordingly, the state argued that Beverly's DCYF contacts concerning her care of her own children some six years

earlier had no relevancy to her testimony regarding what she was able to observe on November 2, 1986, in the apartment. The trial justice sustained the state's objection.

On appeal Wilding asserts that the trial justice erred in restricting his counsel's cross-examination of Beverly on the subject of her DCYF contacts. After reviewing the trial record, we conclude that the trial justice did not err in restricting the cross-examination.

■ We agree that "[a] criminal defendant is constitutionally guaranteed the right to an effective cross-examination of the prosecution's witnesses." *State v. Bettencourt*, 723 A.2d 1101, 1109 (R.I.1999) (quoting *State v. Brown*, 709 A.2d 465, 473 (R.I.1998)). However, we also recognize that "the scope of cross-examination is subject to reasonable limitation by the trial justice's exercise of his or her sound discretion.'" *Id.* The trial justice may exercise discretion to narrow the cross-examination as long as he or she does not "unduly restrict" a defendant's right to cross-examination. *Id.* at 1109–10.

Here the trial justice did not abuse his discretion by excluding defense counsel's cross-examination of Beverly regarding her own childcare history with DCYF. It was her powers of observation on November 2, 1986, that were the legitimate subject for cross-examination by defense counsel. Beverly's own prior experiences with DCYF simply had little to do with her ability to have observed Cassandra's physical condition on November 2, 1986. We conclude that the trial justice's ruling, limiting the scope of defense counsel's cross-examination of Beverly, fell clearly within his broad discretion to limit and control questioning on such an extreme collateral matter, and that discretion, we conclude, was not abused.

## V

### The Baby's Screech

Richard Oatley (Richard) testified for the state. At the time of the incident in

question, Richard owned both 16 Bowdoin Street, where Beverly Vanasse had a first-floor apartment, and 20 Bowdoin Street, where he and his wife Rhonda Oatley resided. Sixteen Bowdoin Street and 20 Bowdoin Street were separated by a twelve-foot driveway. Over defense counsel's objections, Richard testified that on the night of November 2, at approximately 7:10 p.m., he heard a sound that he characterized as a baby's screech. He testified that "[i]t sounded like a baby's screech, when they got hit or they didn't get their own way." Defense counsel, in objecting to that testimony, asserted that Richard's testimony as to what he heard sounding like a baby's screech would not be helpful to the trial jury in understanding his testimony or determining any fact in issue. He also argued that the fact that Richard could not say for certain where the sound had come from undermined the probative value of his testimony and increased its prejudicial effect.

Rule 701 of the Rhode Island Rules of Evidence provides:

> "Opinion testimony by lay witnesses.—If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

■ Lay-opinion testimony may be rendered when "the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express an opinion are such that [persons] in general are capable of comprehending.'" *Bettencourt*, 723 A.2d at 1111. Our review of the trial court's decision to permit opinion testimony by a lay witness is limited to determining whether the trial justice abused his or her discretion by allowing such testimony. *State v. Mallett*, 600 A.2d 273, 276 (R.I.1991).

We observe from the record that Richard's testimony concerning the sound resembling a baby's screech that he heard at approximately 7:10 p.m. was certainly relevant in light of the previous testimony given by his wife, Rhonda. She had testified that at 6:30 p.m., when she visited Beverly's apartment where Wilding was babysitting, Cassandra was then in good physical condition and had no bruises or facial markings. When Rhonda left the apartment at approximately 7 p.m. Cassandra's condition was the same. The sound of what appeared to Richard to have been a baby's screech at about 7:10 p.m., when Wilding was alone with Cassandra in the nearby apartment, would be helpful to the jury in determining if and when Wilding had hit Cassandra and inflicted the injuries upon her. The state obviously presented that evidence in order to establish that it was more probable than not that Cassandra had been injured by Wilding after Rhonda left the apartment but before Julie and Beverly returned at about 10:30 p.m.

■ Proffered evidence is considered probative and relevant "when it renders the existence of the fact sought to be proven more or less probable than it would have been without the evidence.'" *Kaner*, 463 A.2d at 1351 (quoting *State v. Parente*, 460 A.2d 430, 436 (R.I.1983); citing *McCormick's Handbook of the Law of Evidence*, § 185 at 437 (2d ed. Cleary 1972)).

■ We believe that Richard's testimony was helpful to the trial jury in determining a material fact that was in issue. Furthermore, despite Wilding's assertions, we discern no existing counterbalancing or unduly prejudicial factors that might have substantially outweighed the probative force of Richard's testimony. We therefore conclude that Richard's testimony was both relevant and probative, and its admission was not an abuse of the trial justice's discretion.

For the reasons stated, the defendant's appeal is denied. His judgment of convic-

tion is affirmed, and the papers in the case are remanded to the Superior Court.