STATE

v.

Julio TORRES.

No. 2001–220–C.A.

Supreme Court of Rhode Island.

Jan. 10, 2002.

ly, Amalie was rescued and survived her subsequent month-long coma; however, upon coming out of the coma, she was completely and permanently blind in both eyes.

On February 12, 2001, a Providence Superior Court jury convicted Julio Torres (Torres or the defendant) on the one count in the indictment; namely, assaulting Amalie with a dangerous weapon in her dwelling with intent to murder.[1] After denying the defendant's motion for a new trial, the trial justice sentenced Torres to fifty years imprisonment, with thirty years to serve, twenty years of which were suspended, and with probation. Judgment was entered, and Torres timely appealed.

Jane M. Mcsoley and Aaron Weisman, Providence, for Plaintiff.

Damon D'Ambrosio, Pawtucket, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In the early morning hours of May 11, 1993, Amalie Santiago (Amalie) was shot in the head and left for dead in her apartment. Her three children, Liana Torres, aged six, Angelica Torres, aged five, and Julio Torres, Jr., aged four, were alone with their mother at the time. Fortunate-

## I

### Facts/Procedural History

In May 1993, Amalie lived with her three children on the second floor of a three-level family tenement on Earle Street in Central Falls, Rhode Island. Her parents owned the building and lived in the first-floor apartment with their thirteen-year-old daughter. In April 1993, Torres, who was the father of Amalie's three children and her boyfriend at the time, also lived in Amalie's second-floor apartment. Amalie and her family knew Torres as "Angelo."[2] It appears that the relationship between Amalie and Torres was very tumultuous and fraught with problems. Indeed, Torres previously had been arrested for assaulting Amalie and pleaded *nolo contendere* to a charge of

---

1. General Laws 1956 § 11–5–4, entitled "[a]ssault with dangerous weapon in dwelling house" provides:
   "Whoever, being armed with a dangerous weapon, assaults another with intent to rob or murder, shall, if the assault is committed within a dwelling house, be punished by imprisonment in the adult correctional institution[s] for not less than ten (10) years to life."

2. The defendant's full name is Julio Angelo Andrea Torres.

domestic assault on May 19, 1992, and was sentenced to probation for one year.

In late March/early April 1993, Amalie determined that her relationship with Torres should end. One night, while he was sleeping, Amalie removed his keys to the apartment from his key chain.[3] The next day, after Torres went to work, she packed all his belongings into garbage bags and left them outside in the tenement hallway. Torres never took his belongings, which eventually were discarded.

Not long after terminating her relationship with Torres, Amalie began dating Valter Sousa (Valter). At the time, Valter was living only a few blocks from Amalie, at his parents' residence on Barber Street. One day in early May 1993, just as Amalie, Valter and Valter's sister Nellie were leaving a Burger King restaurant in Amalie's car, the defendant drove up in his car, a Z28 red Camaro. Visibly agitated, the defendant approached Amalie as she sat in the driver's seat of her car and threateningly demanded to know who Valter was and why he was with her. Not wanting to be the cause of a confrontation between Amalie and Torres, Valter got out of the car and began to walk away. Torres then turned towards Valter who, fearing that Torres was about to attack him, "got in his face" and pushed Torres away. Torres responded by threatening Valter, saying that Valter would pay for what he had done.

Thereafter, Torres began going to Amalie's apartment, ringing the doorbell and demanding that she come to the door so that they could talk. Amalie refused to respond to his antics. On May 9, 1993, two days before the shooting, Amalie went to visit her cousin, Brenda Carrasco (Brenda), with Valter. A furious Torres appeared and confronted Amalie in front of Brenda's house and demanded that Amalie reveal the nature of her relationship with Valter. Instead of answering, Amalie ignored Torres and proceeded upstairs to Brenda's apartment. Enraged at being snubbed by Amalie, Torres then called out to Brenda to:

> "tell your cousin [Amalie] to tell me the truth. Tell her if she don't tell me that I'm going to do something big and no one will ever know. No one's going to be able to get me."

On May 10, 1993, Amalie left her children with Brenda at Brenda's home so that she could go to work at an Ames department store where she was employed part time. While she was at work, Torres drove to the store and informed Amalie's supervisor that he wished to speak with her. Amalie received the message, but refused to meet with him; instead, she continued working until her shift ended between 9:45 p.m. and 10 p.m. Thereafter Amalie went to pick up both Valter and her children and they went to a local Chinese restaurant to purchase a take-out order. They then rented a movie from Major Video and retrieved Amalie's VCR from Torres's mother.[4] At Torres's mother's home, Valter and Amalie observed Torres lurking in a next-door neighbor's driveway, watching them. He did not approach them, however, and they managed

---

**3.** Although there are two entrances to Amalie's apartment, both she and Torres used and had keys for only the back door entrance. Amalie's parents possessed the only key to the front door entrance of Amalie's apartment. That door always was locked.

**4.** Amalie previously had lent her VCR to Torres's mother. Both women continued to enjoy an amicable relationship, even after Amalie's breakup with Torres.

to leave without incident and return to Amalie's apartment.

Once they arrived at the apartment, Amalie fed the children and put them to bed. Although Valter and Amalie had intended to eat after the children had settled, instead, Valter left and went to Attleboro with his brother and brother-in-law, leaving Amalie alone with her sleeping children. After Valter left, Amalie ate her take-out dinner and then watched part of the rented movie.

Later, at approximately 1:30 a.m. on the morning of May 11, 1993, Amalie's mother, Ursula Santiago (Ursula), arrived home after working the evening shift at the nearby Texas Instruments plant. She entered the apartment building, locked the door from the inside and called out to see if Amalie was still awake. She was, and mother and daughter then conversed for several minutes at the door to Amalie's apartment. After bidding good night to her daughter, Ursula left and went downstairs to her own first-floor apartment. Amalie then checked the doors to her apartment to make certain they were locked and she went to bed.

Shortly thereafter, while Ursula and her husband, Adrian Santiago (Adrian), were asleep in their downstairs apartment, Ursula was awakened by a loud noise. She immediately awakened her husband and they both jumped out of bed. Thinking that the noise had come from inside their apartment, Ursula rushed into the kitchen and, after observing nothing unusual, she went to look out the kitchen window. As she was going toward the window, she noticed that the L.E.D. display on the kitchen's microwave clock showed exactly

3:32 a.m. When she looked out the window, Ursula saw Torres, whose face was illuminated by the light of a nearby streetlight, quickly walk by her and down the driveway. Fearing the worst, she told Adrian to go upstairs to check on Amalie and the children.

Adrian, who also saw and recognized Torres walking in the driveway, rushed upstairs and knocked on the back door to Amalie's apartment. No one responded to his knocking. When Adrian returned downstairs he told Ursula that no one was at home. Ursula told him that she was positive that Amalie was there and to go back and check again. This time, although Adrian could not enter the locked back door entrance, he heard what seemed to be labored breathing. Panicked, he ran back downstairs and retrieved the only key to Amalie's front door. His worst fears were realized. He found his daughter lying in a pool of blood on her apartment floor while his distraught five-year old granddaughter, Angelica, stood over her mother, weeping. He asked the child what had happened, whereupon she said "Papa lo hiso." [5] Angelica's older sister, six-year old Liana, then came out of her bedroom and told him that: "Daddy did it." Adrian screamed downstairs for Ursula to call for an ambulance. She did.

Shortly thereafter, police and rescue arrived. The rescue personnel treated and then removed Amalie. Meanwhile, a police officer went into in an adjoining bedroom, where he found the three children. They were huddled together, and Angelica and Liana were "both crying, very upset" and had "tears running down their eyes— gasping, trying to catch their breath." After the officer had calmed the children

---

**5.** Translated from Spanish, "Papa lo hiso" means Papa did it. The record reveals that

Angelica referred to her father, the defendant Julio Torres, as "Papa."

down somewhat, he asked them what had happened. Angelica told him that her father had come to their home, that he had argued with her mother and he had accused her of kissing Valter. She said that as she "peeked" out the bedroom door, she saw him take a gun and "[h]e killed my mommy[.]" Liana, who did not actually witness the shooting, also overheard the altercation. She reiterated Angelica's account of the argument between their parents. Based upon these statements, as well as the statements given by Amalie's parents and other investigative evidence, the police issued an arrest warrant for Torres. He was nowhere to be found, but his treasured Z28 Camaro was found just a few blocks away from the scene of the crime.

Seven years later, on April 20, 2000, Torres was apprehended and arrested in Ponce, Puerto Rico, by U.S. Marshals from the Federal Fugitive Task Force. As the U.S. Marshals were escorting Torres back to a local Puerto Rican police station, U.S. Deputy Marshal Andres Jiminez (Deputy Marshal Jiminez) initiated a conversation with the defendant. During the course of that conversation, Torres confessed to Deputy Marshal Jiminez that he had "shot his wife" and that the reason he had done so was "because she was cheating on him; that he was all messed up back then."

Before trial, Torres filed several motions in limine to exclude certain testimony that the state proposed to introduce at trial, as well as a motion to suppress the statements that he allegedly made to Deputy Marshal Jiminez. In denying the motions in limine, the trial justice noted that his denials were subject to later redetermination at trial when the challenged evidence referred to in the motions would be offered

into evidence. At the hearing on Torres's motion to suppress the incriminating statements he allegedly made to Deputy Marshal Jiminez, Torres denied that he ever had made such statements and contended that even if he had, they were inadmissible because the U.S. Marshals did not read his *Miranda* rights to him after he was placed in custody.[6] The trial justice denied Torres's motions *in limine* as well as his motion to suppress. Torres now appeals those rulings.

Additional facts will be supplied as deemed necessary in the legal analysis of the issues raised in this appeal.

## II

### Analysis

**1. The Motions in Limine**

Before trial, the defendant filed several motions *in limine* seeking to exclude evidence proposed by the state concerning: (1) the defendant's encounter with Amalie and Valter at the Burger King restaurant two days before the shooting; (2) the statements Amalie's children made to the police at the scene of the crime; and (3) the threatening remarks the defendant made to Brenda and against Amalie when he was at Brenda's house. The trial justice denied the motions, but, as noted earlier, reserved ruling on the actual admissibility of the proposed evidence until such time that the state offered the evidence for admission and established the proper foundational requirements for their admission.

■ "The motion *in limine* 'has become widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a

---

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

significant amount of time at the trial.' " *Ferguson v. Marshall Contractors, Inc.,* 745 A.2d 147, 150 (R.I.2000) (quoting *Gendron v. Pawtucket Mutual Insurance Co.,* 409 A.2d 656, 659 (Me.1979)). Its purpose "is to 'prevent the proponent of potentially prejudicial matter from displaying it to the jury * * * in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.' " *State v. Fernandes,* 526 A.2d 495, 500 (R.I.1987) (quoting *Lagenour v. State,* 268 Ind. 441, 376 N.E.2d 475, 481 (1978)). The preliminary grant or denial of an *in limine* motion "need not be taken as a final determination of the admissibility of the evidence referred to in the motion." *Fernandes,* 526 A.2d at 500. *See also State v. Quattrocchi,* 681 A.2d 879, 888 (R.I.1996) (Flanders, J., dissenting). Indeed, in appropriate circumstances, a trial justice may reconsider a prior motion *in limine* determination without committing error per se. *See Fernandes,* 526 A.2d at 500. Consequently, "[t]he only consideration on appeal is 'whether the evidence and cross-examination was proper and admissible, and if not, whether the error was sufficiently prejudicial to warrant reversal.' " *Id.* (quoting *Gilliam v. State,* 270 Ind. 71, 383 N.E.2d 297, 301 (1978)). Thus, the threshold question before us concerning Torres's first claim of error is whether the testimony Torres challenged was properly admissible at trial, and if not, whether its admission sufficiently prejudiced Torres to warrant reversal of his conviction.

■■■ "In a criminal prosecution the state is entitled to present all evidence relevant to the crime charged." *State v. Young,* 743 A.2d 1032, 1036 (R.I.2000). Questions of relevancy, including whether the probative value of proffered evidence is outweighed by the danger of its undue prejudice, "are left to the sound discretion of the trial justice." *State v. Gomes,* 764 A.2d 125, 136 (R.I.2001) (quoting *State v. Garcia,* 743 A.2d 1038, 1050 (R.I.2000)). We will not second-guess a trial justice's decision concerning relevancy on appeal unless we first determine that the trial justice's decision was both a prejudicial "abuse of discretion *and* if the admission of the irrelevant evidence was prejudicial to the rights of the accused." *Gomes,* 764 A.2d at 136 (quoting *State v. Robertson,* 740 A.2d 330, 335 (R.I.1999)).

### (a) The Prior Threats

■■■ In the case before us, the defendant made prior threats against both Valter and Amalie. The first such threat was made against Valter outside Burger King two days before the shooting. Torres made his second prior threat against Amalie outside Brenda Carrasco's apartment, and in Brenda's presence on the day before the shooting. The defendant contends that the evidence of his prior threats against Valter and Amalie was unfairly prejudicial because there was no nexus between those threats and the subsequent shooting of Amalie two days later. Consequently, Torres maintains that Rule 404(b) of the Rhode Island Rules of Evidence[7] precluded the trial justice from admitting the evidence of his prior threats, and he asserts that the trial justice erred in deny-

---

**7.** Rule 404(b) of the Rhode Island Rules of Evidence provides as follows:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that *defendant feared imminent bodily harm and that the fear was reasonable.*"

ing his motions *in limine* to exclude admission of that evidence. We disagree.

■ Except in certain circumstances that are inapplicable to this case, a threat of bodily injury or "a threat to kill without more does not constitute a criminal offense under the laws of this state." *State v. Pule,* 453 A.2d 1095, 1097 & n. 1 (R.I. 1982).[8] Therefore, it is only when evidence of prior threat made by a defendant is "both prejudicial and irrelevant [that it becomes] inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence." *Gomes,* 764 A.2d at 136. Otherwise, evidence of a prior threat made by a defendant to an intended victim may be admitted. That is because:

> "Evidence of a prior threat made by a defendant is relevant to the question of whether the defendant 'acted with malice or premeditation, or whether he had a motive to commit the crime.' * * * Although motive is not an essential element of [assault with intent to commit] murder, '[e]vidence of motive is often probative and relevant, and therefore admissible in proper circumstances. * * * [S]uch evidence must not lead the jury to speculate and must not improperly open up collateral matters.' " *State v. Bibee,* 559 A.2d 618, 620–21 (R.I.1989) (quoting *Pule,* 453 A.2d at 1098).

In *Bibee,* we upheld as relevant the admissibility of a threat made one and one-half years before the homicide concerned in that case. *Bibee,* 559 A.2d at 621. In *Pule,* the admissible threat was a conditional threat and was made approximately seven or eight weeks before the killing. *Pule,* 453 A.2d at 1099. In *State v. Pep-*per, 103 R.I. 310, 314, 237 A.2d 330, 333 (1968), the defendant's argument with his wife within three years of her murder "was relevant to the issue of defendant's general feeling towards her and was competent evidence from which the jury could reasonably have drawn inferences with respect to defendant's state of mind towards her on the day of her death."

In the instant case, we believe that the two separate threats that Torres made within two days of the shooting, likewise, were relevant to the issue of his general feelings toward Amalie and to her relationship with Valter. A reasonable jury certainly could have inferred from those threats that Torres was extremely jealous and possessive of Amalie, and that such feelings could have generated his motive to shoot and murder her. Clearly, Torres's threats constituted relevant evidence and their probative value to the state's burden of proof far outweighed any prejudice that might have resulted therefrom to Torres. We are satisfied that the trial justice did not abuse his discretion in denying the motion *in limine* and in later admitting the evidence at trial.

**(b) The Children's Statements**

■ Torres next contends that the trial justice erred in denying his motion *in limine* to exclude the statements made by five-year old Angelica and six-year old Liana. He asserts that their statements constituted impermissible hearsay, and that the trial justice abused his discretion when he admitted the statements at trial.

The case record reveals that when Adrian arrived at the scene three to five min-

---

8. Indeed "[e]ven if the statement[s] were [ ] criminal offense[s], * * * [they] would have been admissible under the exception enunci-ated in *State v. Colangelo,* 55 R.I. 170, 174, 179 A. 147, 149 (1935)." *State v. Pule,* 453 A.2d 1095, 1098 n. 2 (R.I.1982).

utes after his wife heard the loud gunshot noise, he found Angelica weeping over the body of her profusely bleeding mother. When Adrian asked her what had happened, she told him, in Spanish, "Papa lo hiso."[9] Liana then came out of the adjacent bedroom and said "Daddy did it."

Very shortly thereafter, the police arrived. The officer who spoke to the children testified that he found all three together in their bedroom, and that Angelica and Liana were "both crying, very upset" and with "tears running down their eyes—gasping, trying to catch their breath." After he succeeded somewhat in calming Angelica and Liana, he asked them what had happened. He testified that Angelica, the "talkative one[,]" told him that "there was an argument between her father and mother" because "Val[ter] had kissed mommy and her father was upset about that." Amalie told the officer that "[h]e killed my mommy" and that she saw what happened because she was peeking out the bedroom door. The officer also testified that Liana told him that she didn't actually see the shooting, but that she had heard what was taking place and that she "more or less reinforced what the younger one was telling me."

At the *in limine* motion hearing, the defendant contended that the children's statements should be excluded because they constituted hearsay and did not fall under the excited utterance exception. The trial justice denied the motion, but told the defendant that he had "the opportunity to object [at trial] if the predicate foundation is not laid or if the there are any other reasons of the evidence not being admissible * * *."

■ "Among the well-established exceptions to the hearsay rule is the excited utterance exception." *State v. Krakue,* 726 A.2d 458, 462 (R.I.1999) (per curiam). We have stated previously that:

> " 'The rationale for the excited utterance or spontaneous exclamation exception is that a startling event may produce an effect that temporarily stills the declarant's capacity of reflection and produces statements free of conscious fabrication.' * * * 'The guarantee of trustworthiness [for the excited utterance exception] is assured as long as the declarant made the statement as an "instinctive outpouring" or an "effusion." ' * * * '[A] statement made in response to a traumatic or startling event is a spontaneous utterance so long as it was made while the declarant "was still laboring under the stress of [the] * * * experience." ' " *Id.*

"The admissibility of an excited utterance is obviously within the trial justice's discretion and 'any decision made by a trial justice concerning the admission of excited utterances shall not be overturned unless clearly wrong.' " *State v. Medina,* 767 A.2d 655, 658 (R.I.2001) (quoting *Krakue,* 726 A.2d at 462).

In the case before us, the record reveals that the statements made by Angelica and Liana occurred within three to five minutes of their mother's being shot and almost immediately after their grandfather arrived at the scene. When he arrived, he discovered Angelica weeping over her mother, who was bleeding profusely and, at about the same time, Liana came out of the adjacent bedroom and was extremely upset. The record also reveals that the children spoke to the police officer within a short time after they spoke to their grandfather and that, at the time, they still were

9. Adrian testified that Angelica referred to him, her grandfather, as "abuelo."

very upset and emotional over what they had just heard and witnessed.

After reviewing this evidence, the trial justice found that the state had established the predicate foundation for the statements to be admitted as excited utterances. He observed that:

> "The whole linchpin of the excited utterance rule is truthfulness or reliability, and I can't say as a matter of law or from the evidence presented that there's any suggestion that either or both children * * * reflected on this and wanted somebody to put them up to saying, 'Daddy did it.'"

From our review of the record, we cannot say that the trial justice was clearly wrong when he admitted the hearsay statements of the children as excited utterances.[10]

## 2. The Motion to Suppress

■ The defendant asserts that the trial justice erred in denying his motion to suppress the testimony of Deputy Marshal Jiminez. He first denies that he ever made the alleged statements to the deputy marshal, and that, even if he had, he was not given his *Miranda* rights after he had been arrested.

At the suppression hearing, both Deputy Marshal Jiminez and Torres testified about each one's individual version of events on April 20, 2000, the day of Torres's arrest in Ponce, Puerto Rico. Not too coincidentally, the respective versions were contradictory.

### (a) The Suppression Testimony of Deputy Marshal Jiminez

Deputy Marshal Jiminez testified that on April 20, 2000, armed with an arrest warrant for Torres, he approached Torres, who was doing construction work. At the time, Jiminez was accompanied by two other U.S. Marshals, as well as by two local police officers (collectively, marshals). Torres identified himself to the marshals as "Angelo Torres." The marshals observed that Torres matched the description given in the arrest warrant, which noted that Torres had a chipped front tooth. Deputy Marshal Jiminez handcuffed Torres's hands in front of his body, placed him in the back of a police vehicle, and left him in the custody of another marshal while he attended to other business for approximately three minutes.

When he returned to the police vehicle, Deputy Marshal Jiminez noticed that Torres's belt had been removed for safety reasons. He then placed Torres under arrest and pulled out a card on which the *Miranda* rights were printed in both English and Spanish. He asked Torres in which language he would prefer to be read his rights. Torres responded "English." After Deputy Marshal Jiminez finished reading Torres his *Miranda* warnings, he asked him whether he understood what he had just heard. Torres responded in the affirmative. Torres did not sign written *Miranda* warnings at that time because, according to Deputy Marshal Jiminez, "we don't conduct that form—normally we don't conduct interviews. Our only concern is identity, to make sure we have the right person." They then set off to the local police station.

During the fifteen-to-twenty-minute drive to the police station, Torres sat in

---

10. Although Liana, unlike Amalie, did not actually see her father shoot her mother, she did hear Torres yelling at her mother and then heard the gunshot. There were only two people in the kitchen, and Amalie did not shoot herself. After the gunshot, Torres no longer was in the kitchen. Thus, Liana certainly could have concluded from what she had just heard that her father had shot her mother.

the back of the vehicle with two marshals. Deputy Marshal Jiminez drove the vehicle and sat next to another marshal. As they were traveling, Deputy Marshal Jiminez asked Torres where he had learned to speak English. Torres responded "Rhode Island." Deputy Marshal Jiminez then said "Okay, then you know why we arrested you[,]" to which Torres responded "Yes, for shooting my wife." Deputy Marshal Jiminez told Torres:

> "Well, to be honest with you, I don't know that much about the case. My Job is just finding you. I know that you are wanted for attempted murder, so I guess that's what it was."

Torres responded, "yeah, he had shot his wife because she was cheating on him; that he was all messed up back then."

Later that day, Deputy Marshal Jiminez memorialized the content of his conversation with Torres.

### (b) The Suppression Testimony of Torres

Torres testified on direct examination that after he was handcuffed, he was placed in the rear seat of the car, where a U.S. Marshal offered to make a deal with him in exchange for information about drug activity in the neighborhood. Torres informed the court that he was not given his *Miranda* rights until approximately sixteen days later, when he returned to Central Falls, Rhode Island. He denied ever making any statements to Deputy Marshal Jiminez.

During cross-examination, Torres testified that his hands were handcuffed behind his back and that he did not see who actually had put them on. He admitted that he had never met any of the marshals before he was arrested. He said he was

unfamiliar with his *Miranda* rights; however, when confronted with a rights form that he previously had signed after his arrest for domestic assault in Central Falls, he admitted that he understood his rights at that time. The following colloquy then took place:

> "Q. So, on April 20, 2000, that wasn't the first time you had heard your rights being given to you?
>
> "A. Guess so."

Later, Torres backpedaled and denied again that he had been given his rights on April 20, 2000.

▉ We have stated previously that in:

> "deciding a motion to suppress a confession, a trial justice can admit the confession against the defendant only 'if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona.*' * * * When this Court reviews a trial justice's denial of a motion to suppress, we give deference to the trial justice's factual findings and will reverse them only if they are clearly erroneous. * * * The question of whether a waiver of constitutional rights was voluntary, however, is a legal question * * * that we review de novo." *State v. Dumas,* 750 A.2d 420, 423 (R.I.2000).

"A determination of voluntariness must be made on the basis of all facts and circumstances, including the behavior of the defendant and the behavior of the interrogators, and the ultimate test 'is whether the defendant's statements were the "product of his free and rational choice" * * * or the result of coercion that had overcome the defendant's will at the time he confess-

ed.'" *State v. Briggs,* 756 A.2d 731, 738 (R.I.2000) (quoting *State v. Griffith,* 612 A.2d 21, 25 (R.I.1992)). In the present case, Torres appears to suggest that before the police may conduct an interrogation, a suspect must sign a written waiver of his or her *Miranda* rights. However, "[t]here is no requirement that *Miranda* warnings be given in writing as a constitutional imperative. Indeed *Miranda v. Arizona,* * * * in its precise holding uses language that would clearly permit oral warnings." *State v. Wilding,* 638 A.2d 519, 521 (R.I.1994). "Nor is there a requirement that a suspect must sign a waiver" even when a defendant is in a custodial setting. *Id.* (citing *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). Thus, the issue in this case is whether Torres was given his *Miranda* admonitions orally, and, if so, did he voluntarily waive those rights.

After hearing testimony from both Deputy Marshal Jiminez and Torres, the trial justice found "Jiminez to be more credible on that single issue of whether or not he was advised of his rights." He then concluded that "[f]rom the evidence presented, I am satisfied that Jiminez did, in fact, advise Mr. Torres of his rights under *Miranda v. Arizona,* and Jiminez did interrogate Torres when he asked him, 'Then you know why we arrested you[.]'" The trial justice noted that "[a]t no point was it ever indicated that Torres wanted a lawyer." There is no evidence in the record to indicate that Torres ever was threatened, cajoled or coerced by the marshals. Indeed, he has not made such allegations. The record does reveal, however, that Torres not only was familiar with his *Miranda* rights, but that he had signed at least one waiver form in the past indicating his understanding of those rights. Based upon this record before us, and following our de

novo review, we discern that the trial justice did not err when he found that the state had proven by clear and convincing evidence "that the defendant did waive the rights that were properly given to him by Officer or Marshal Jiminez."

For the foregoing reasons, the defendant's appeal is denied and dismissed. The judgment of conviction is affirmed and the papers in this case are remanded to the Superior Court.