**STATE**

v.

**Dennis C. CARLSON.**

No. 80–461–C.A.

Supreme Court of Rhode Island.

July 17, 1981.

Dennis J. Roberts, II, Atty. Gen., Joel D. Landry, Asst. Atty. Gen., Joseph P. Ippolito, Jr., Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Janice M. Weisfeld, Asst. Public Defender, for defendant.

OPINION

KELLEHER, Justice.

The defendant, Dennis C. Carlson (Carlson), stands convicted of (1) murder, (2) assault with intent to murder, and (3) possession of a sawed-off shotgun. Guilty verdicts were entered in the Superior Court following a seven-day trial. The sole issue before us is the trial justice's denial of Carlson's motion to suppress a statement given to the police in which he confessed to having murdered his girl friend's father.

Carlson's girl friend was Lori Provost (Lori). Her father, Ernest Provost (Provost), was shot at his home on Tripps Lane in East Providence at approximately 10:30 a. m. on June 9, 1977. David B. Kinney (Kinney), an employee of the Narragansett Electric Company, testified that he was at work checking meters on that morning when he heard a "bang." Kinney then heard someone calling for help; when he looked, he saw Provost holding his back and falling to the ground. As Kinney walked toward Provost, he saw a man kneeling with a gun. Nicholas Marra (Marra), the owner of a nursing home that was then being built in an area adjacent to the Provost residence, upon hearing the shot, came running toward Kinney, who hollered to Marra, "Watch it." At this point, the gunman turned toward Marra and pulled the trigger. Marra fell to the ground, his right side riddled with buckshot. Neither Kinney nor Marra could identify Carlson as the gunman.

However, Mrs. Linda Ippolito was able to identify Carlson. She was washing dishes at her home at the time Provost was shot and happened to be positioned near a window that faced the Provost property. She heard the shot and the hollering and looked up to see "a boy" come running "out of the trees" with a gun. At the trial, Mrs. Ippolito identified Carlson as that "boy."

The State Medical Examiner gave the cause of Provost's death as a shotgun wound in the back and described the death as homicidal.

The confrontation that had taken place between Carlson and Provost was explained by Lori. Her father did not approve of her friendship with Carlson. Provost had repeatedly told Carlson to stay away from his daughter. However, both Lori and Carlson ignored the parental admonitions and continued to see each other. In fact, they talked of running off to California, but a lack of funds put a crimp in this excursion plan.

On June 6, 1977, or thereabouts, Lori and her father had a dispute in which the father struck the daughter and chased her out of the house. When Lori returned home, she called Carlson to come by and pick her up. Provost would not permit her to leave the premises. Eventually, Lori did leave the house and joined Carlson. On the evening of June 8, 1977, she and Carlson partied, "smoking angel dust, and you know, drinking a few beers." This revelry continued into the early morning of June 9. The two napped in an automobile from 2 a. m. to 6 a. m., and then Carlson drove Lori from East Providence to her sister's home in Central Falls. Lori testified that Carlson had no problem driving the car on that occasion.

Paul D. Young (Young) testified that he and Carlson worked at an automobile-salvage yard located in East Providence on Warren Avenue. In early June 1977, Young was sharing his living quarters with Carlson. When Young returned home on June 7, 1977, he found Carlson "very upset" and crying because Lori had been beaten up by her father. Carlson, who at that time was fondling a shotgun, told Young he was going to shoot Provost. Young responded, "No way is it worth hurting anyone over a girl." Young then took the shotgun away from Carlson and put it in a spare room.

Shortly after the shooting, suspicion focused on Carlson. On the day after the shooting, June 10, 1977, the East Providence police received information that Carlson could be found in a car awaiting salvage which was stored in a lot across the street from the salvage yard. Several officers responded to the call. In testifying at the suppression hearing, Detective Robert J. Cooke (Cooke) told the trial justice that when he arrived in the area of the lot, he saw Carlson in the car "sitting in the front seat behind the steering wheel with a shotgun up against his neck." Carlson told Cooke that his life was "pretty much over," and that he wanted to kill himself. He continued for the next twenty minutes to hold the gun to his head and to make suicidal threats. At one point in their conversation, Carlson threatened to kill Cooke. Cooke began to give Carlson his *Miranda* warnings, at which point Carlson told Cooke that he didn't need "that crap" and that he had killed Provost.

The police were finally able to convince Carlson to walk across the street to the salvage yard's office. There, Carlson was given a cup of coffee and a cigarette. Carlson agreed to keep the gun on his lap while the police kept their distance. He was given his *Miranda* warnings, and Carlson explained, "He had to be wasted, nobody else was going to do it, so I did it."

Carlson finally surrendered his weapon when the police complied with his request that he be allowed to speak to Lori. He was then taken to the East Providence police headquarters. While on the way, he was again given his *Miranda* warnings and he again told the police that he had killed Provost. After arriving at the station, Carlson and Lori had a supervised tête-à-tête. Subsequently, Carlson signed both a waiver-of-rights form and a written statement in which he confessed to the murder of Provost.

Cooke testified that Carlson had answered the questions quite readily and clearly. He conceded that Carlson's suicidal threats were not the actions of a normal individual but noted that otherwise Carlson acted normally in many respects. According to the detective, when he first saw Carlson, he was "just sitting there * * * rather calmly with the shotgun up against his neck." Cooke also said that prior to signing the written statement, Carlson had asked that he be permitted to call an attorney. He was handed the phone book. At that point, Carlson apparently changed his mind, be-

cause he said, "No, you guys have been fair with me, and I'll give you a statement."

Detective Renald L. Langlois (Langlois) corroborated much of what Cooke had described. He also told the trial justice that Carlson had expressed pleasure with the treatment accorded him and was happy "to get this off my chest." The witness also made it clear that he detected no odor of alcohol or any indication that Carlson at that time was under the influence of drugs.

Carlson's mother was allowed to speak to her son immediately after the written confession had been obtained. According to her, Carlson was crying hysterically and looked like a "whipped dog." Carlson, she said, told her, "I don't know what I really did. * * * I really should have blown my brains out." The mother conceded that she had no expertise with drugs but was of the opinion that her son must have been "way out on something."

The trial justice, after listening to the suppression evidence, found that Carlson had acted voluntarily in both waiving his rights and in confessing to the Provost homicide.

The issue in this appeal is Carlson's constitutional privilege against self-incrimination and the question of whether he voluntarily waived this privilege when he confessed to the murder of his girl friend's father. We see no need to recite with chapter and verse the lengthy list of United States Supreme Court rulings that serve as our guide on considering this appeal. To those who may be interested in reading these opinions, we would direct their attention to *State v. Killay*, 430 A.2d 418 (R.I. 1981); *State v. Amado*, R.I., 424 A.2d 1057 (1981); *State v. Bello*, R.I., 417 A.2d 902 (1980).

■ When the state sought to use Carlson's confession, it then assumed the burden of proving that before Carlson confessed, he voluntarily and knowingly waived his constitutional privilege against self-incrimination. In making an assessment about whether or not there has been a valid waiver, the trial justice has to consider the totality of the relevant circumstances existing at the time the confession was made. The prosecution is also required to establish the requisite voluntariness by clear and convincing evidence, and the trial justice's determination of this issue, since it is factual, will not be disturbed on appeal unless the factfinder is clearly wrong.

■ A confession, to be voluntary, must be the product of a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960). Carlson argues that he was in such a distraught state of mind during his confrontation with the police on June 10, 1977, both in the salvage-yard environs and at the police station, that he was at that time neither rational nor operating with a free will. However, the record indicates that Detective Langlois told the trial justice that when he saw Carlson sitting in the car with the rifle tucked under his chin, he did not appear to be under the influence of either alcohol or drugs. This witness is an officer who has spent a considerable portion of his police service investigating violations of the Uniform Controlled Substances Act. The trial justice relied on his testimony rather than accept the contrary belief expressed by Carlson's mother, which belief was based upon her son's behavior rather than any knowledge she might have had that he was in fact on that day under the influence of drugs or liquor.

■ We are not about to fault the trial justice's observation that Carlson's confession was the product of remorse rather than that of a mind bereft of free will. Suicidal declarations per se do not prove a lack of free will. Rather, such actions may indicate remorse or desperation. *Commonwealth of Pennsylvania v. Maroney*, 348 F.2d 22 (3d Cir. 1965). Remorse is not an uncommon emotion to be found in most of us with the possible exception of the most hardened criminal. *Crummel v. State*, 46 Wis.2d 348, 353, 174 N.W.2d 517, 519 (1970). Carlson's desire "to get this off my chest" brings to mind the thought expressed by Lady Macbeth's physician whose patient found herself in a situation somewhat similar to Carlson's:

"Foul whisperings are abroad. Unnatural deeds Do breed unnatural troubles: Infected minds To their deaf pillows will discharge their secrets, More needs she the divine than the physician."
—Macbeth, act V, scene 1.

Although Carlson's mother described her son as hysterical, it is reasonable to believe that such hysteria was nothing more than her son's manifestation of sorrow and grief induced by the sight of his ever-loyal and loving mother. The East Providence police were insistent that the mother's son exhibited no indications of hysteria when he gave the confession and appended his signature thereto. Here, the East Providence police were "midwife to a declaration naturally born of remorse * * *." *Culombe v. Connecticut,* 367 U.S. 568, 576, 81 S.Ct. 1860, 1864, 6 L.Ed.2d 1037, 1043 (1961). The sole responsibility of the police at the time in question was to safeguard and to protect the suspect's Fifth Amendment privilege. The fact that they discharged this responsibility in an exemplary manner and, at one point, under very difficult conditions can be found in Carlson's own words when he said, "No, you guys have been fair with me, and I'll give you a statement." An examination of the record gives us no reason to disturb the findings made by the trial justice.

The defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the case is remanded to the Superior Court.