**STATE**

v.

**Robert KENNEDY.**

**No. 88–603–C.A.**

Supreme Court of Rhode Island.

Feb. 8, 1990.

James E. O'Neil, Atty. Gen., Caroline Cole Cornwell, Sp. Asst. Atty. Gen., for plaintiff.

Charles J. Rogers, Jr., Providence, for defendant.

## OPINION

MURRAY, Justice.

This case comes before this court on appeal from a Superior Court justice's denial of the defendant's motion to suppress. The defendant contends that his confession was obtained in violation of his constitutional rights. A precis of the facts as adduced from the record will assist in our analysis.

The defendant was accused of assaulting a woman in her Warwick home late in the evening of December 9, 1986. The perpetrator entered the house by kicking in a door. He was wearing work pants, a dark jacket, and a dark-colored ski mask. He left behind a pair of rubber gloves inscribed with words "Frank's Safety Crew" on the back. The victim described her assailant as a white male of about twenty-five years of age, five foot eight inches tall, with an athletic-muscular build. Although the attacker wore a dark-colored ski mask, the victim believed that the attacker probably had brown eyes and brown hair.

Once in the house the attacker raped the woman and forced her to commit oral sex. During the assaults the assailant appeared to know the victim and called her by both her first and her last names. He then robbed the victim of $50. When he fled the home, the assailant left behind the rubber gloves.

On January 7 at about 2:30 p.m., two police officers went to the door of defendant's home. They were dressed in plain clothes, drove an unmarked police car, and never displayed any weapons. When they rang the doorbell defendant answered the door. The police officers then noticed that defendant matched the victim's description of her assailant. They identified themselves and asked defendant to come to the police station to answer some questions in connection with an investigation they were conducting. The court found that defendant agreed to go by answering "Yeah, sure." The defendant also stated that he had no means of transportation. The officers offered defendant a ride and waited for him in their vehicle while defendant dressed. In fact the officers remained outside the door of the house during the entire conversation with defendant. The defendant testified that the police officers remained polite and courteous.

While the officers waited, defendant spoke with his sister. He told her to tell

their father that he would be at the police station. She did not accompany her brother to the station, nor did she give him a ride despite the fact that she had a car. She instead watched a soap opera and went back to sleep.

Five minutes later defendant came out of the house, opened the rear door of the officers' car, and sat alone in the back seat. There was no screen or grate between the front and the rear seats. At no time was he frisked, handcuffed, or questioned by the officers during the ride to the station.

At the station defendant followed the officers up the back stairs to the detectives' area. He was left alone in an interview room while the officers retrieved some paperwork, including a rights form.

At about 3 p.m., one of the officers advised Kennedy that he was a suspect of the crime involving sexual assault. The officer then read aloud the various rights contained in the rights form and asked defendant to explain each of them. After defendant had done that and had acknowledged that he understood them all, he signed the rights form.

During the next hour the officers questioned defendant about the offenses of December 9. The defendant admitted knowing the victim and members of her family. He also admitted owning the same type of rubber gloves as those left at the scene, but he claimed not to know where they were. He denied having committed the crimes.

At the conclusion of that interview a second police officer told defendant that he did not believe him. He asked defendant if he would take a polygraph test, and defendant agreed.

The police department's polygraph examiner was not then on duty. While awaiting the examiner's arrival, defendant was again left alone in the interview room. The door remained half open, and he was not handcuffed or otherwise physically restrained. Nor were any protective pat downs of defendant performed by any police officer. One officer provided defendant with coffee.

The examiner arrived at about 4:45 p.m. and was briefed by one of the two officers outside defendant's presence. The officer advised the examiner of the nature of the investigation, defendant's responses during the initial interview, and the officer's opinion that defendant was lying.

The polygraph examiner entered the interview room, introduced himself to defendant, and asked him if he was willing to take a polygraph test. The defendant agreed and was handed a four-page loose-leaf booklet describing the nature of a polygraph examination. Those pages were preceded by a one-page letter generally addressed to the person who was to be examined. That letter included the following sentence: "Just because you are here today for your polygraph examination, it does not mean that you have to stay: you may leave at any time you wish just by telling me you wish to leave." The defendant was advised to read the material carefully. The defendant was left alone in the room, with the door half open for approximately ten minutes. The examiner observed what he believed to be defendant engaged in reading the polygraph booklet. Shortly thereafter, the polygraph examiner reentered the room and asked defendant if he had any questions. The defendant replied, "No."

The polygraph examiner directed defendant to the lavatory and told him to wash his hands before taking the examination. Before defendant entered the lavatory, however, the examiner told him that he was free to leave at any time. He also told defendant that he could leave even after the examination had commenced.

When defendant came out of the lavatory, the polygraph examiner went through each of the *Miranda* rights with him. The examiner asked defendant to explain in his own words what each admonition meant. The defendant replied in coherent and appropriate fashion, evidencing what the officer believed to be his clear understanding of each right. The examiner again told defendant that he did not have to take the polygraph examination. At this time defendant indicated that he

wanted to speak to his father before taking the examination. He was allowed to phone home where he reached his sister who told him that his father was at the laundromat.

After defendant attempted unsuccessfully to reach his father a second time, defendant waited in the interview room by himself. When the polygraph examiner returned, he told defendant that sometimes emotions overcame people and caused them to do things that should not be done. At that point defendant became emotional, embraced the polygraph examiner, and began to cry. He admitted his guilt and showed remorse for his actions. The defendant then recounted in detail the assault, which an officer wrote down at defendant's request. The defendant reviewed it, initialed each line, swore to its accuracy, and then signed it.

On April 29, 1987, defendant was arraigned in Kent County Superior Court on a five-count indictment: count 1, burglary; count 2, sexual penetration with force; count 3, sexual penetration with force; count 4, robbery; and count 5, assault on a person over the age of sixty. Before trial, defendant filed a motion to suppress his confession. On April 26, 1988, the trial justice filed a seventeen-page decision denying defendant's motion to dismiss. The defendant now appeals claiming that the trial justice erred in denying his motion to suppress his confession at the police station.

The defendant disputes much of the above rendition of the facts. He claims that he was never advised of his rights until after he had confessed. Moreover, defendant claims that he was under arrest when he accompanied the police to headquarters for questioning. Such an arrest would have been illegal because there was no probable cause to justify the arrest. Therefore, defendant's subsequent confession would be the fruit of an illegal arrest and inadmissible based on the exclusionary rule. *State v. Mattatall*, 510 A.2d 947, 952 (R.I.1986).

The state concedes that an arrest would not have been supported by probable cause. Instead the state claims that this defendant was not arrested or seized for Fourth Amendment purposes.

In *State v. Bailey*, 417 A.2d 915 (R.I.1980), we established the criteria for determining whether an arrest or seizure has taken place. These factors include: "[1] the extent to which the person's freedom of movement has been curtailed and the degree of force used by the police * * * [2] the belief of a reasonable innocent person [concerning his/her inhibition of movement] in the same circumstances * * * and [3] [the question of] whether the person had the option of not going with the police * * * ." *Id.* at 917–18. *See Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247, 255 (1984); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).

Applying these factors to the instant case, we find that defendant was not in custody. The defendant voluntarily agreed to accompany the police officers to the station. The officers did not pressure defendant, nor did they use force to physically restrain him; they waited in the car for defendant to get dressed. The defendant himself said that he needed a ride to the station.

The defendant cannot claim to have been in custody merely because the questioning occurred at the police station and defendant was a suspect in the crime. *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 713, 50 L.Ed. 2d 714, 719 (1977); *State v. Caruolo*, 524 A.2d 575, 579 (R.I.1987); *see Minnesota v. Murphy*, 465 U.S. 420, 430–31, 104 S.Ct. 1136, 1144, 79 L.Ed.2d 409, 421 (1984). While at the station defendant sat in an interview room and the door was left partly open. The trial justice found that he was told that he was free to go. The defendant was also given a polygraph-test book that stated that he was free to go. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (an important factor in finding that the defendant was seized was the fact that he was never informed that he was "free to go"). Upon the facts of the instant case this court concludes that a reasonable-inno-

cent person would have believed he was free to go.

The defendant cites the case of *State v. Mercurio*, 96 R.I. 464, 194 A.2d 574 (1963), to support his argument that he was under arrest. In that case, however, the facts were significantly different. There a husband and a wife were taken into custody because the officers believed that a misdemeanor had been committed. The husband was fingerprinted and photographed. Moreover, the detective referred to the wife as a "female prisoner" in his testimony at trial. *Id.* at 467, 194 A.2d at 575.

■ In contrast, in the instant case no formal procedures were initiated that indicated that this defendant was under arrest. The only procedure that was employed here was that of *Miranda* warnings which notified defendant that he was free not to speak and free to seek the assistance of an attorney. Advice and information concerning *Miranda* rights will not serve as evidence of an arrest.

■ Further, defendant claims that his confession was not voluntary because he was not told that he was free to leave at any time. The trial justice, however, found that defendant was given his *Miranda* rights repeatedly. He was also given a polygraph booklet that advised him that he was free to go. The examiner also told him that he could leave even after the examination had commenced.

This issue of defendant's voluntariness depends on whose testimony the court chooses to believe. The trial justice based his finding that the defendant was not truthful on the defendant's demeanor and responses. The trial justice was in the best position to observe that which occurred at trial. This court, therefore, will not reverse the trial justice's finding on the issue of voluntariness unless the trial justice is clearly erroneous. *State v. Baton*, 488 A.2d 696, 701 (R.I.1985); *State v. Lemon*, 478 A.2d 175, 177 (R.I.1984); *State v. Ortiz*, 448 A.2d 1241, 1245–46 (R.I.1982); *State v. Fuentes*, 433 A.2d 184, 189 (R.I. 1981); *State v. Carlson*, 432 A.2d 676, 679 (R.I.1981). The record is devoid of evidence to support a finding that the trial justice was clearly wrong; rather the record affirms the findings of fact made by the trial justice.

The defendant's appeal is denied and dismissed. The judgment appealed from is affirmed.