**STATE**

**v.**

**Marc A. GIRARD.**

**No. 2001–282–C.A.**

Supreme Court of Rhode Island.

May 28, 2002.

Virginia M. McGinn, Aaron L. Weisman, Providence, for Plaintiff.

Michael J. Gardiner, Warwick, for Defendant.

Present: WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this brutal, barbaric and utterly senseless "thrill kill," the defendant, Marc A. Girard, appeals from his conviction by a Superior Court trial jury for first-degree murder and conspiracy to commit murder. He maintains on appeal that the trial justice erred in failing to suppress his confession, in refusing to give instructions to the jury on second-degree murder or manslaughter, and in sentencing him to consecutive terms on his convictions. We deny his appeal and affirm his convictions.

### I

#### Facts/Procedural History

In the early hours of the morning of Monday, June 14, 1999, after a weekend of drinking, defendant Marc Girard (Girard) was walking to his apartment in Woonsocket, when he encountered Jeanette Descoteaux (Jeanette), who also was out walking. Jeanette, who also had been

drinking, engaged in small talk with Girard. She invited him to accompany her to her friend's second-floor apartment, where they might procure some cocaine and beer. He agreed to go.

When they arrived, they were greeted by Jeanette's friends, Debbie Desrosiers (Debbie) and Renee Edwards (Renee). There was no cocaine or beer in the apartment, so Jeanette's friends persuaded Girard to give them money to purchase drugs. He gave Debbie $60 and instructed her to use $50 to purchase drugs and to either purchase some liquor or bring back $10 in change. She returned with some cocaine and the change. The three women shared the cocaine while Girard smoked a cigarette. Meanwhile, Girard repeatedly asked Jeanette whether she needed a ride home.

Sometime later, Girard gave Debbie another $20 and she promptly left to purchase more cocaine. Simultaneously, Girard left and went to get his car. On his way out of the apartment, he asked Debbie whether Jeanette needed a ride, and Debbie told him that if she did, Jeanette would meet him downstairs. When Girard returned in his car, a red Nissan SX, Debbie was outside waiting for her drug delivery. He again asked Debbie whether Jeanette needed a ride. She responded with the same answer—if Jeanette needed a ride, she would come downstairs. Girard then told Debbie that he would be back in ten minutes.

Approximately fifteen minutes later, Debbie observed Girard banging on a neighbor's door. She told him he was at the wrong house and asked him why he had left his car engine running. He in-formed her that a friend of his was waiting in the car.[1] He then followed her upstairs to her apartment, where he persuaded Jeanette to leave Debbie's apartment with him. Debbie witnessed Jeanette get into Girard's car with him and his friend, Alfred Brissette (Brissette). That was the last time Jeanette was seen alive by anyone other than Girard and Brissette.

In the car, Girard and Brissette told Jeanette that they knew a drug dealer by the name of "Uncle Bob" who lived in a cabin in the woods of Burrillville.[2] They promised her that "Uncle Bob" would supply her with all the cocaine she ever could possibly want. Persuaded by their promises, Jeanette agreed to switch from Girard's Nissan to Brissette's rented four-wheel-drive Chevrolet Blazer (the Blazer) at the defendant's home. As they were about to leave there for Burrillville, Girard took a camping shovel from the house. Approximately eighteen months earlier, Brissette and Girard had conspired to randomly kill and bury an unsuspecting and unfortunate female. Brissette had purchased the shovel for the express purpose of digging a grave to bury whoever they murdered. Usually, it was kept in the trunk of Girard's Nissan so that it readily would be available if and when they were to carry out their brutal, preconceived plan.

Meanwhile, Brissette, who was driving the Blazer, stopped the vehicle on a fire trail in the woods of the George Washington Park in Burrillville. Girard exited the vehicle and went to relieve himself in the woods. While Girard was gone, Brissette persuaded Jeanette to perform oral sex upon him in return for the promised cocaine. Unsatisfied with Jeanette's perfor-

---

1. It subsequently was revealed that the other person in the car was Alfred Brissette, the defendant's friend and coconspirator in this case.

2. It appears that "Uncle Bob" was a fictitious person used as a pretext to lure to Jeanette into the woods.

mance, Brissette demanded that she engage in sexual intercourse with him. He opened the trunk of the Blazer, put down the rear seat and then he and the now-naked Jeanette climbed into the back of the Blazer to engage in sexual intercourse. After that, Brissette reached into the back of the Blazer for a plastic bag containing a lug wrench and smashed it into Jeanette's head. Jeanette was stunned and asked Brissette what he was doing, to which he responded by again striking her head with the lug wrench. She screamed "[s]top, stop. No, I'll take care of you." Meanwhile, Girard, who had witnessed the brutal blows, attempted to soothe the still-naked Jeanette by giving her a cigarette and telling her that she needed to calm down, otherwise she might bleed to death. Jeanette promised the defendant that if they brought her to a hospital, she would not tell anybody what had happened.

In the meantime, Brissette, who had been rummaging about in the Blazer, reappeared and handed the shovel to Girard and directed him to dig a hole. Girard took the shovel and began to dig, but was unable to accomplish the task because the ground was too rocky. Suddenly realizing the implications of what was happening, the wounded and bleeding Jeanette sprang to her feet and began to run for her life. Girard immediately stopped digging and returned to the Blazer. Brissette then grabbed the shovel from Girard and the two men hastily pursued Jeanette. Brissette pursued her from behind while Girard ran to the outside so that he could cut her off and prevent her from escaping. As they neared Jeanette, Brissette struck her with the shovel while Girard grabbed her around her waist and dragged her back to the Blazer.

Girard again tried to calm the now-terrified Jeanette and promised her that they would bring her to the hospital. He later

admitted knowing that he and Brissette had no intention of letting her go. The men ordered Jeanette to get dressed. After she had dressed, Brissette began to hit her repeatedly with his fists and with the lug wrench. She fell to the ground. Girard then struck her in the spine in an attempt to paralyze her. Both men then dragged her farther into the woods. As Jeanette lay on the ground "gurgling," Girard viciously struck her head three times with the lug wrench because:

> "I thought she was still alive. I was just—she—she was wounded bad. I was just trying to put her out of her misery. I didn't want her laying out there for days still alive, bleeding."

At that time, Girard believed that it was he who had struck the fatal blow.

After Girard and Brissette decided that Jeanette probably was dead, they left her body in the woods and returned to the Blazer. They then attempted to cover their tracks by concealing the evidence. They gathered the shovel, lug wrench and plastic bag, and placed them in the back of the Blazer on top of an orange tarp, which they covered with a blanket. They left the scene and went to Brissette's house to retrieve clean clothing for him. They subsequently went to Girard's house to shower off the blood. Coincidentally, that day was trash day in the neighborhood, so they placed their bloody clothing in a trash bag, put the bag in a lidded trash can and left it out for collection. They put the orange tarp in a canvas duffel bag and also left that out for collection. Feeling satisfied with their endeavors, they went to Dunkin' Donuts for coffee and later had breakfast at the home of a friend of Girard. After breakfast, Girard and Brissette washed and vacuumed the Blazer at a local car wash. Later that night, they drove to Beaver Tail Park in Jamestown and threw

both the shovel and the lug wrench into Narragansett Bay.

Two days later, on June 16, 1999, Debbie spotted Girard in his red Nissan as he was driving in downtown Woonsocket. The vehicle that she was riding in was being driven by her cousin, Carol Turner.[3] She immediately recognized Girard as the person with whom she had last seen Jeanette, and the two women gave chase. Girard did not recognize Debbie at first, but when he did, he became nervous and accelerated his car. After a somewhat lengthy chase, Girard noticed Woonsocket Police Patrolman Gary Turgeon (Officer Turgeon) on the sidewalk and decided to pull over and "play[ ] dumb." Simultaneously, Carol pulled her vehicle over to the sidewalk. Both women immediately jumped out of the vehicle and began telling Officer Turgeon that their friend was missing, and that Girard was the last person to be seen with her.

Girard claimed he didn't know the women and that he didn't remember anything from the night in question because he had been very intoxicated at the time. Officer Turgeon noted that all three people were very agitated and tried to calm them down. He identified Girard by his driver's license and then radioed the police dispatcher to inquire whether there was a missing person report out on Jeanette. There was. Knowing that a detective would have been assigned to the case, he requested "all the parties to drive to the police station and try to straighten out the matter." He radioed the police dispatcher, explained what had happened, and informed the dispatcher that the parties would be arriving at the police station shortly. He then told Girard that he would check up on him at the end of his shift to determine whether he actually went to the police station. Thereafter, Girard and the two women got into their respective vehicles and drove themselves to the nearby police station.

At the police station, Girard was directed to meet with Detectives Todd Brien and Robert Moreau. In accordance with general procedure, the "station man" on duty escorted him upstairs to an interview room. When Girard met with the detectives, he informed them that, indeed, he had met Jeanette on the night of June 14, 1999. The detectives reviewed the missing person report and advised him of his *Miranda* rights.[4] They also gave him a written rights form, which he signed. The form indicated that Girard was a suspect in a "missing person" case.

In a written statement, Girard acknowledged that he had met Jeanette late Sunday night or early Monday morning while walking home. He recounted how he went with her to her friend's house, gave them money for drugs and offered to give her a ride to her home. He then stated that he walked home to get his car. He said that Brissette was at his home and offered to drive because he was drunk. He stated that the last time he saw Jeanette was when he and Brissette dropped her off, unscathed, on Morin Heights Boulevard in Woonsocket. He denied that there had been any sexual activity between Jeanette and either himself or Brissette. After he gave his statement to the police, Girard signed a consent form allowing the police to search his car. He was informed that he would have to leave his car overnight at the police station, and Detective Brien offered to give him a ride home. Girard accepted the offer and was driven home.

---

**3.** On Tuesday, June 15, 1999, Jeanette's friend Carol Turner filed a missing person report with the police concerning Jeanette's disappearance.

**4.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The next morning, June 17, 1999, Girard returned to the police station to retrieve his car. He again was asked to assist the police with their inquiries, and was accompanied upstairs to an interview room at approximately 9:30 a.m. by Detectives Brien and Moreau.[5] Girard again was advised of his *Miranda* rights and signed another rights form that listed him as a suspect in a missing person case. When the detectives informed him that there were inconsistencies between his statement and that of Brissette, he informed the detectives that he hadn't been completely forthright with them and that he now wanted to tell the truth about what happened.

At first, Girard told the detectives that after he and Brissette picked up Jeanette, Brissette dropped him off at his home. Girard said Brissette later told him that he brought Jeanette out to the fire trails in George Washington Park (the park), got upset with her, punched her teeth out and then left her in the park. Girard also informed the detectives that he knew where Brissette had left Jeanette, and volunteered to take the detectives to that place. Meanwhile, realizing that the park was not within their jurisdiction, the detectives contacted the state police, whose jurisdiction is statewide.

At approximately 11 a.m. that morning, Girard left the Woonsocket police station with Woonsocket police officers, Detective Moreau, Detective Sevigny and Sgt. Timothy Paul.[6] They brought him to the Chepachet state police barracks in an unmarked Ford Taurus. When they arrived, Detectives Moreau and Sevigny went inside. Sergeant Paul remained outside with Girard while they each smoked a cigarette. They then went inside the building. Once there, Girard began talking to the officers. The Woonsocket officers once again advised him of his *Miranda* rights. Later, State Police Sgt. John Blessing[7] arrived. He, too, advised Girard of his *Miranda* rights and Girard signed another rights form at 1:40 p.m. This particular form indicated that Girard was suspected of committing "murder/assault."

Officer Blessing first interviewed Girard, and then later took a formal, taped statement from him. After the statement had been reduced to writing, Girard reviewed it and initialed all his responses. In doing so, he made several corrections to the statement. It was in this statement that he admitted that Jeanette was dead and that he was an accomplice.[8] He also admitted that he knew Brissette intended to kill her, but neglected to mention that he himself brutally and viciously had struck Jeanette on the head with the lug wrench. Just as Girard finished giving this statement, the state police were in-

---

5. After Girard had left the station on the previous day, the police interviewed Brissette. Because Brissette's statement was inconsistent with that of Girard's, the police wished to speak to Girard to clear up the inconsistencies.

6. Sergeant Paul since has been promoted to lieutenant.

7. Sergeant Blessing also has been promoted to lieutenant.

8. It is interesting to note that in the course of giving his June 17, 1999 statement, Girard admitted that he feared Brissette would incriminate him for the murder. He stated that Brissette came to his workplace after Brissette had been interviewed by the police. Brissette informed Girard that he had told the police that he paid Jeanette $20 for a "blow job," after which he dropped her off, unharmed, at the residence from where they picked her up. At approximately 2:30 a.m., after Girard finished work, the two met at Dunkin' Donuts to go over their story. Girard alleged that, in doing so, Brissette attempted to bribe him to confess to the murder.

formed that Jeanette's body had been discovered. Girard was arrested immediately, and subsequently was charged with committing murder and with conspiracy to commit that murder. At the time of his arrest, he again was advised of his *Miranda* rights and signed another rights form. He then was placed in handcuffs. Later, Girard was taken to the State Police barracks in Lincoln by Trooper Raymond Studley.[9]

During the fifteen-to twenty-minute ride to Lincoln, Girard initiated a conversation with Trooper Studley. He admitted that he had not been completely honest in the statement he had given at the Chepachet barracks. Trooper Studley immediately advised Girard that he did not have to talk, and that his *Miranda* rights were still available to him. Girard acknowledged that although he was aware of his rights, he wished to be completely honest. He informed Trooper Studley that in fact he did strike Jeanette several times with the lug wrench and that he and Brissette had disposed of the shovel and lug wrench in Narragansett Bay at Beavertail State Park in Jamestown. He then volunteered to show the police the exact place where the weapons had been thrown into the ocean.

The next morning, June 18, 1999, Sergeant Blessing again interviewed Girard. During that interview and in a later formal statement, he admitted that he had struck Jeanette three times on the head with the lug wrench and that he and Brissette had disposed of the murder weapons in Narragansett Bay. Girard had been advised of his *Miranda* rights and had signed rights forms both before the interview, and before his formal statement. Later, he showed the police where he and Brissette

had thrown the murder weapons. The weapons were recovered by police divers.

Before trial, Girard filed a motion to suppress all the statements he had made to the police. He maintained that he had been illegally detained by the police from the outset and that, consequently, all his statements were taken in violation of his Fourth Amendment rights. After hearing testimony and reviewing the evidence, the trial justice denied the suppression motion and the case proceeded to trial before a Superior Court jury. The jury subsequently convicted Girard of first-degree murder and conspiracy to commit murder. He was sentenced to a term of life imprisonment on the murder conviction and to a consecutive ten-year term of imprisonment on the conspiracy conviction. Girard later filed a motion for a new trial, alleging that the trial justice erred in failing to instruct the jury of the lesser-included offenses of second-degree murder and manslaughter. The trial justice denied the new-trial motion, and a timely appeal to this Court followed.

Additional facts will be provided as necessary for our analysis.

## II

### Motion to Suppress

Girard here on appeal asserts that the trial justice erred in denying his *in limine* motion to suppress all the statements that he made to the police both before and after his arrest. He maintains that he made all of his pre-arrest statements while he was illegally detained in violation of his Fourth Amendment rights and that, as a result, all his post-arrest statements were fruits of the poisonous tree.

9. Unlike the Chepachet barracks, the Lincoln barracks was fully staffed at night; consequently, it was considered to be a more se-
cure location for overnight prisoners. Trooper Studley has since been promoted to lieutenant.

Specifically, Girard asserts that, for Fourth Amendment purposes, he was under arrest when Officer Turgeon asked him to go to the police station because he felt that he had no other choice than to obey the order. He maintains that he was placed in custody when he first was brought upstairs to the interrogation room. To support this assertion, he notes that for him to go upstairs, he had to enter through a security door, which required a police officer to press a buzzer to open. He posits that when the door closed behind him, he automatically was placed into police custody. In addition, he contends that all his statements were coerced while he was in a custodial setting because the police officers did not tell him he was free to leave. Moreover, he alleges that the trial justice erred in failing to properly articulate or address these issues in his factual findings.

In denying the motion to suppress, the trial justice stated that:

"[t]here is a point obviously where this defendant was clearly in custody. There's no bright line as to where it might have occurred, but even if on June 17th, after the defendant presented himself at the station in Woonsocket to retrieve his vehicle, thereafter was in an interview room with an officer, even at that time I think it's a stretch to say he was in custody."

From this factual finding, it is obvious that the trial justice rejected the defendant's contention that he was in custody during the time he was at the Woonsocket police station on June 16 and 17, 1999. Although he did not specify exactly when Girard actually was seized and placed in custody, we will assume for purposes of this decision that he was placed in custody shortly thereafter; namely, when he was transported to the state police barracks in Chepachet on June 17, 1999.

■ The factors to be considered to determine whether an arrest or seizure had taken place are enunciated in *State v. Bailey*, 417 A.2d 915 (R.I.1980). These factors encompass:

"[1] the extent to which the person's freedom of movement has been curtailed and the degree of force used by the police * * * [2] the belief of a reasonable innocent person [concerning his/her inhibition of movement] in the same circumstances * * * and [3] [the question of] whether the person had the option of not going with the police * * *." *Id.* at 917–18.

■ There is no question that at some point, Girard was taken into custody and arrested by the police. "To evaluate defendant's assertion that his confession resulted from illegal seizure or arrest, we must determine first whether he was 'seized' when the statement was made and, if so, whether the seizure was supported by probable cause." *State v. Ferola*, 518 A.2d 1339, 1343 (R.I.1986).

Applying the *Bailey* factors to the instant case, we hold that Girard certainly was not in custody during his first encounter with the police on June 16, 1999. The record reveals that he voluntarily approached Officer Turgeon on the street and that, upon the officer's request, he voluntarily drove himself to the police station. Officer Turgeon did not pressure Girard or physically force him to go to the station. Officer Turgeon did not accompany him to the police station to ensure that he complied with his request because at that time he did not suspect Girard of having committed a crime. Indeed, at that point it was not even clear that a crime had been committed.

While at the station, Girard went to a second-floor interview room by way of a security door. For him to enter through

that door, a police officer first was required to release the lock by pressing a buzzer from the inside. Girard suggests that even if he voluntarily went to the police station, once he went through that security door, the police had an affirmative duty to tell him he was free to leave at any time. He maintains that because they did not do so, a reasonable person in his circumstances would believe that he was not free to leave. That contention is without merit. *See Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247, 255 (1984).

To begin with, there is no evidence in the record that the specific security door could not be opened manually from the inside, thus, allowing a person to freely leave the police station. Girard was read his *Miranda* rights and he signed a rights form but the record reveals that the police did not initiate any formal arrest procedures against him to indicate that he was under arrest. He was not fingerprinted and photographed. *See State v. Kennedy*, 569 A.2d 4, 8 (R.I.1990). Although the police did not tell Girard that he was free to leave; likewise, they never told him that he was not free to leave. *See State v. Kryla*, 742 A.2d 1178, 1182 (R.I.1999). In fact, he actually did leave the station and was driven home by Officer Brien.

We also note that Girard had the option of not going to the station on June 16, 1999, and, considering that he left freely, his personal freedom apparently had not been curtailed. Furthermore, "[o]ur conclusion that no seizure occurred [at that time] is not affected by the fact that [Girard] was not expressly told by the [officers] that [he] was free to decline to cooperate with their inquiry, for the voluntariness of [his] responses does not depend upon [his] having been so informed." *Kryla*, 742 A.2d at 1182 (quot-

ing *United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497, 510 (1980)). Accordingly, we conclude from the record evidence that a reasonable person in these circumstances would not believe he was under arrest.

After Girard's first interview, Detectives Moreau and Brien interviewed Brissette. They discovered that his description of the events of June 14, 1999, differed considerably from that of the defendant's. They decided that they would like to question Girard once again to further clarify the obvious discrepancies between their stories. So, when Girard voluntarily returned to the police station to retrieve his car on June 17, 1999, the detectives suggested, and he readily agreed, to go upstairs with the detectives to the interview room for further inquiries. Again he was given his *Miranda* rights and again he signed a rights form.

It was during the second interview that the police discovered that something seriously was amiss. Girard told the police that Brissette had assaulted Jeanette and left her on one of the fire trails in George Washington Park. Despite the fact that he said that he had not witnessed the incident, he volunteered to show them the exact location where he said the assault had taken place. The detectives, who at this point had become very suspicious of Girard, and who realized that the case no longer was within the jurisdiction of the Woonsocket police, decided to bring him to the state police barracks in Chepachet. He was brought there by three Woonsocket police officers in an unmarked police car. At the suppression hearing, the Woonsocket officers denied that Girard was in custody when they took him to the Chepachet barracks; however, they later testified at trial that, indeed, Girard at that time was not free to leave.

Once at the state police barracks and while waiting for state police detectives to arrive, Girard initiated a conversation with the Woonsocket police. They again advised him that his *Miranda* rights were still available to him and that he did not have to speak. He informed them that he was aware of his rights but, nevertheless, he wanted to be completely honest with them. He told the police that Jeanette was dead and admitted that he was an accomplice in her murder. He also admitted that he and Brissette previously had discussed randomly killing a female and burying her with the shovel that Brissette had purchased and which he normally kept readily available in his car for that purpose. Meanwhile, Jeanette's body was discovered by the state police.[10] Just as Girard was finishing his statement, the state police officers who had discovered Jeanette's body returned to the Chepachet state barracks and subsequently arrested Girard.

In applying the *Bailey* factors to the events of June 17, 1999, we conclude that Girard was not in custody prior to being taken to the Chepachet state police barracks by the three Woonsocket police officers. The record reveals that before that occurred, he had volunteered to assist the Woonsocket police in their investigation and volunteered to show the police where the crime had taken place. There is no evidence that the police used force or coercion upon Girard in order to obtain those statements. We conclude that Girard truly did not believe that he was under arrest prior to being taken to the state police barracks. We next must determine whether the police had probable cause to arrest him at that point. *See Davis v.*

*Mississippi,* 394 U.S. 721, 724–25, 89 S.Ct. 1394, 1396, 22 L.Ed.2d 676, 679–80 (1969).

■ "The United States Supreme Court has held that a police officer may arrest a suspect without a warrant if, before the arrest, the officer has probable cause to believe that the suspect has committed a crime." *State v. Guzman,* 752 A.2d 1, 4 (R.I.2000) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) and *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)). "Establishing the existence of probable cause to arrest a person does not require the same degree of proof needed to determine whether that person is guilty of the crime in question." *Guzman,* 752 A.2d at 4 (citing *Draper,* 358 U.S. at 311–12, 79 S.Ct. at 332, 3 L.Ed.2d at 331).

■ "Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a reasonable person's belief that a crime has been committed and that the person to be arrested has committed the crime." *Kryla,* 742 A.2d at 1182 (quoting *State v. Jenison,* 442 A.2d 866, 873–74 (R.I.1982)). "Additionally, probable cause is determined under a flexible 'totality-of-the-circumstances' analysis." *Kryla,* 742 A.2d at 1182 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). "Because probable cause is an issue of constitutional magnitude, this Court reviews *de novo* such mixed questions of law and fact in accordance with the dictates of *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911, 919 (1996); *State v. Camp-*

---

10. Apparently Brissette, also was cooperating with the police and showed them where Jeanette's body was located.

*bell,* 691 A.2d 564, 569 (R.I.1997)." *Kryla,* 742 A.2d at 1182. Accordingly, we now must examine whether Girard's police escorted conveyance to the state police barracks amounted to an unreasonable seizure in violation of the Fourth Amendment.

 When the Woonsocket police took Girard to the state barracks, the police officers had reasonably trustworthy information that a crime had been committed; namely, they knew by Girard's own statements that, at a minimum, the crime of assault had been committed upon Jeanette in the early morning hours of June 15, 1999, after which she had been left in the woods by a fire trail. They also knew that Jeanette was missing and had not been seen since shortly before that time; that Girard and an unidentified male were the last people to be seen in her company; that Brissette was the unidentified male; that Girard and Brissette had given inconsistent statements; and, that Girard, who had asserted he had not been present at the scene of the assault, nonetheless was able to tell the police exactly where the crime had occurred.

In view of this evidence, we conclude that the police had ample probable cause to arrest Girard at the time he was taken to the state police barracks on June 17, 1999. *See Kryla,* 742 A.2d at 1182 (citing *Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441, 450 (1963)). Consequently, assuming that he was in custody when the Woonsocket police transported him to the Chepachet state police barracks, we conclude that Girard's Fourth Amendment rights were not violated because the officers had probable cause to arrest him at that time.

The next issue we must address is whether, after Girard had been given his *Miranda* rights, he knowingly, intelligently and voluntarily waived those rights thereafter, and voluntarily gave his statements to the police.

 It is well settled that in:

"deciding a motion to suppress a confession, a trial justice can admit the confession against the defendant only 'if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in *Miranda v. Arizona.'* * * * When this Court reviews a trial justice's denial of a motion to suppress, we give deference to the trial justice's factual findings and will reverse them only if they are clearly erroneous. * * * The question of whether a waiver of constitutional rights was voluntary, however, is a legal question * * * that we review *de novo.*" *State v. Torres,* 787 A.2d 1214, 1224 (R.I.2002) (quoting *State v. Dumas,* 750 A.2d 420, 423 (R.I. 2000)).

"A determination of voluntariness must be made on the basis of all facts and circumstances, including the behavior of the defendant and the behavior of the interrogators, and the ultimate test 'is whether the defendant's statements were the "product of his free and rational choice" or the result of coercion that had overcome the defendant's will at the time he confessed.'" *Torres,* 787 A.2d at 1224–25 (quoting *State v. Briggs,* 756 A.2d 731, 738 (R.I.2000) and *State v. Griffith,* 612 A.2d 21, 25 (R.I. 1992)). "Th[e] issue of [a] defendant's voluntariness depends on whose testimony the court chooses to believe." *Kennedy,* 569 A.2d at 8.

 In the instant case, there is clear and copious evidence that Girard freely and voluntarily waived his rights. After the hearing on his *in limine* motion, the trial justice found Girard to be "an articulate, intelligent fellow" who "seems rather clever." He noted that he could "not re-

call in any case where there have been so many admonishments of *Miranda* rights as are present in this case." He observed that Girard had signed six rights forms and there were at least five other instances in which he orally was reminded of his rights. The trial justice declared that "[t]here is no question in my mind that this defendant's rights, so far as having been administered to him, were administered fully, completely, *ad nauseum*." The trial justice rejected, "in its entirety," Girard's contention that he "thought that having once signed a waiver form on June 16th at 11:18 in the morning he was, therefore, somehow obliged to continue to speak to the officers, even if he didn't want to." Indeed, the trial justice said: "[i]t is my belief that the defendant very much wanted to talk to these officers."

The trial justice then concluded that:

"I'm satisfied from the totality of the circumstances that the State has satisfied its burden of demonstrating by clear and convincing evidence, indeed even beyond peradventure in my mind, that this defendant understood his *Miranda* rights; that he voluntarily, without coercion of any kind, decided to speak with the officers in all respects; that his decision to do so on various occasions when he did offer statements was a decision that was a product of his free and intelligent choice."

Following our *de novo* review of the record, we cannot say that the trial justice erred in finding that Girard understood and voluntarily waived his *Miranda* rights before each statement he gave to the Woonsocket police and to the state police on June 16, 17 and 18, 1999. In addition, we reject Girard's appellate contention that the trial justice erred in failing to articulate sufficient factual findings as to the time that Girard was taken into custody. We observe that the trial justice specifically found that Girard was not in custody while he was at the Woonsocket police station. Thus, even if he did not expressly determine that Girard was in custody when he was transported to the state police barracks, that omission was harmless in light of the fact that at that time, there was ample probable cause for the police to have done so.

## III

### Motion for a New Trial

Girard next maintains that the jury reasonably could have believed that "his acts could have been the product of a diminished capacity complicated by his codefendant Brissette's fostering of evil impulses[,]" and that he was showing "compassion" when he struck Jeanette as she lay dying because he merely was "put[ting] her out of her misery." Accordingly, he contends that the trial justice erred in failing to instruct the jury on charges of second-degree murder and manslaughter, and asserts that the trial justice further compounded that error when he refused to grant him a new trial on this issue.

"We have repeatedly held that in deciding a motion for a new trial, the trial justice must determine 'whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt.'" *State v. Truesdale,* 787 A.2d 1172, 1178 (R.I.2001) (quoting *State v. Scurry,* 636 A.2d 719, 725 (R.I.1994)). In doing so, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994). "If, after conducting this independent review, the trial justice agrees with the jury's verdict or if the evidence is such that reasonable minds could differ as to the outcome, the motion for a new trial

should be denied." *State v. Otero*, 788 A.2d 469, 472 (R.I.2002) (citing *State v. Marini*, 638 A.2d 507, 515–16 (R.I.1994) and *State v. Clark*, 603 A.2d 1094, 1096 (R.I.1992)).

If "the trial justice finds that the state has failed to sustain its burden of proof, a new trial must be ordered." *Clark*, 603 A.2d at 1096. "In enunciating a ruling on a new-trial motion, 'the trial justice need not refer to all the evidence supporting the decision but need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards.'" *Otero*, 788 A.2d at 472 (quoting *Banach*, 648 A.2d at 1367). "If this Court determines that 'the trial justice has complied with the requisite procedure and articulated an adequate rationale for denying a motion for a new trial, that decision will be given great weight and will not be disturbed unless the trial justice "overlooked or misconceived material evidence relating to a critical issue or if the justice was otherwise clearly wrong."'" *Otero* 788 A.2d at 472 (quoting *State v. Bleau*, 668 A.2d 642, 646 (R.I. 1995)).

Girard asserts that the trial evidence supported a verdict of second-degree murder or manslaughter and that the trial justice erred when he failed to so instruct the jury. We disagree. "It is well settled that a criminal defendant is 'entitled—and the trial justice is required—to instruct the jury on [a] lesser included offense * * * [w]hen the evidence supports a possible verdict on a lesser included offense.'" *State v. Brown*, 744 A.2d 831, 838 (R.I.2000) (quoting *State v. Messa*, 594 A.2d 882, 884 (R.I.1991)). "However, an instruction on a lesser of-

fense is not necessary 'when such a charge is wholly unsupported by the evidence.'" *Brown*, 744 A.2d at 838 (quoting *State v. Figueras*, 644 A.2d 291, 294 (R.I.1994)). "Because defendant in this case was on trial for first-degree murder, 'he was also on trial for all lesser-included offenses and, thus, was simultaneously on trial for [second-degree murder and manslaughter].'" *Brown*, 744 A.2d at 838 (quoting *State v. Grabowski*, 644 A.2d 1282, 1286 (R.I. 1994)). It is axiomatic that "[t]he distinction between first-degree and second-degree murder is that first-degree murder 'requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not.'" *Brown*, 744 A.2d at 838 (quoting *Grabowski*, 644 A.2d at 1285). "[I]f that premeditation is more than momentary, the murder is in the first degree and no charge on second degree murder is necessary; if it could be less, then the offense may be murder in either the first or second degree, and a charge on both must be given." *State v. Campbell*, 691 A.2d 564, 572 (R.I.1997) (quoting *State v. Myers*, 115 R.I. 583, 591, 350 A.2d 611, 615 (1976)). "Premeditation and deliberation are not elements of murder in the second degree." *State v. Barrett*, 768 A.2d 929, 944 (R.I.2001) (quoting *Grabowski*, 644 A.2d at 1285).

The record clearly shows that Girard and his coconspirator, Brisette, carefully and deliberately planned to murder a female, any female, and that he and Brisette had discussed the idea over the previous year and one-half. Moreover, Girard admitted that the murder was premeditated.[11] He also admitted that he and Bris-

---

11. In his June 18, 1999 taped statement to the police, the following testimony was elicited:
 "Q. Marc, you know what premeditated means; right?

 "A. Yes, I do.
 "Q. Okay. And from what you have told us here today, that this was a premeditated incident, okay? In other words Alfred

sette previously had planned to murder a female in the woods in Burrillville, dig a grave, and then bury her body. Brissette purchased a shovel for that purpose and Girard used to keep it in the trunk of his car for ready access.

At trial, Girard's brother, David Girard (David), testified that on several occasions, he had overheard his brother and Brissette discuss killing a female and burying that person in the Burrillville woods. On one occasion, he heard Brissette announce that he had found the "perfect spot" to bury the body, and on another occasion, while in the Burrillville woods with Girard and Brissette, he observed Brissette "mark [a] tree with his pocket knife so he would always remember it." David also testified that after the defendant had been arrested, he visited with him in prison. There, Girard admitted "that his hands were just as dirty as Fred [sic,]" and that "[h]e helped Fred do it, kill her."

It could not be clearer from this record that for the preceding one and one-half years, Girard and Brissette coldly and calculatedly planned to kill a female. Unfortunately for Jeanette, she just happened to be in the wrong place at the wrong time when Girard seized upon her vulnerability to carry out his savage and atrocious plan. He knew, when he lured her into his car, that he and Brissette were going to kill her, and kill her he did. Indeed, an instruction on a lesser-included offense was wholly unsupported by the evidence, and if such an instruction had been given, it would have been totally unjustified. We conclude that the trial justice did not err in refusing to instruct the jury on a lesser-

included offense and properly refused to grant a new trial on this issue.

## IV

### Consecutive Sentences

 Girard finally contends that the trial justice improperly sentenced him to a consecutive ten-year sentence of imprisonment for the conspiracy conviction in addition to the mandatory life sentence imposed for the first-degree murder conviction. He asserts that the trial justice failed to follow *State v. Mollicone,* 746 A.2d 135 (R.I.2000) and *State v. McMaugh,* 672 A.2d 877 (R.I.1996) to justify the pronouncement of these consecutive sentences. However, because Girard's appeal on this issue is procedurally flawed,[12] we need not address that issue.

 Once again, we reiterate that:

"in the absence of 'extraordinary circumstances,' this Court will not consider the validity or the legality of a sentence on direct appeal. * * * Rather, we have repeatedly held that the proper procedure for a review of a sentence begins in the Superior Court under Rule 35 of the Superior Court Rules of Criminal Procedure. * * * In the event that a defendant continues to be aggrieved by the ruling of the Superior Court, this Court then will review the decision on appeal." *State v. Bettencourt,* 723 A.2d 1101, 1114 (R.I.1999) (quoting *State v. Collins,* 679 A.2d 862, 867 (R.I.1996)).

Similar to the circumstances in *State v. Brigham,* 638 A.2d 1043, 1047 (R.I.1994), Girard in this case essentially is challenging the length of his sentence. Also like

[Brissette] and yourself wanted to get this girl and the specific purpose of bringing her out to the woods was to kill her?
"A. That's what he wanted, yes.
"Q. That's what he wanted?
"A. And I went along with it."

12. The record reveals that Girard did not first seek a motion to reduce sentence pursuant to Rule 35 of the Superior Court Rules of Criminal Procedure.

*Brigham,* Girard here has failed to raise any issue amounting to an extraordinary circumstance on appeal. "[B]ecause the issue raised does not amount to an extraordinary circumstance, the absence of a determination made pursuant to a Rule 35 motion precludes this Court's consideration of the defendant's challenge to his sentence." *Bettencourt,* 723 A.2d at 1114.

For the foregoing reasons, the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed and the papers in this case are remanded to the Superior Court.